[Crim. No. 6255.    Second Dist., Div. Two.    Apr. 29, 1959.]

THE PEOPLE, Respondent, v. WILLIAM T. BURGESS, Appellant.

Sidney Broffman for Appellant.

Stanley Mosk, Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Respondent.

HERNDON, J.—Appellant was charged in five counts with accepting bribes (Pen. Code, § 68) and in a jury trial was found not guilty on count I and guilty on counts II through V. He appeals from the judgment and from the order denying his motion for a new trial. Since the sufficiency of the evidence to sustain the conviction is not questioned, we may condense our summary of the voluminous record except as it relates to appellant's specific assignments of error.

Appellant was employed as a Driver's License Examiner for the Department of Motor Vehicles at the Hope Street office in downtown Los Angeles. He resided in Alhambra. During 1957 he had dealings at his home with each of the four persons identified in the counts on which he was found guilty. Each of these persons (all foreign born and recent immigrants) testified that he had given appellant the sum

of $20 to obtain a driver's license. The driver's license application fee is but $3.00. Appellant failed to give these persons the required examinations to test their knowledge of the traffic laws and their driving ability.

In urging reversal of the judgment, appellant contends (1) that the trial court erred in admitting evidence which he insists was the product of an unlawful arrest, and (2) that the district attorney was guilty of prejudicial misconduct in questioning appellant in such a manner as to suggest to the jury that he had perpetrated other similar offenses in addition to those charged.

During April, 1957, appellant's activities were the subject of an intensive investigation by Mr. Fitzpatrick and Mr. Beckwith, investigators (Veh. Code, § 136) employed by the Department of Motor Vehicles. The investigation disclosed that the accident-death and injury rate on licenses which appellant had issued was appreciably higher than the normal. During the course of their investigation, Fitzpatrick and Beckwith interrogated approximately 20 people who stated that they had gone to appellant's home, paid him $20 and obtained driver's licenses without passing the required qualifying tests. Moreover, the investigators received oral communications from an officer of the California State Highway Patrol to the effect that a collateral investigation of appellant's activities was being conducted by that department.

The investigators established contact with a Mr. Klementich, who told them that he had been a runner for appellant, had taken a number of people to his home in Alhambra, where appellant had issued licenses to them for the sum of $20 each. For about two weeks prior to April 30, 1957, the investigators had appellant's house in Alhambra under periodic surveillance from about dusk to approximately midnight. During this time they observed a number of vehicles coming to appellant's residence, from which adults, mostly male, would alight and enter appellant's residence, remaining there from 30 to 45 minutes and then departing. The investigators observed Klementich come to the house with different people on four different occasions before they became personally acquainted with him.

Mr. Nicholas Bobrick was employed by the investigators to pose as a recent immigrant to this country and to attempt to obtain a driver's license from appellant. For the purposes of the investigation, Mr. Bobrick used the name Nikola Bradovic, and obtained an immigrant's card in that name.

He approached Klementich, who agreed to take him to appellant's house, and did so on the evening of April 25, 1957. During the course of the interview, he represented himself as unable to speak English and communicated to appellant through Klementich. Appellant took the false immigration card and filled out a preliminary application for a driver's license. Appellant then asked whether Bobrick had ever applied for a license under any other name, whether he had ever failed to pass a test for or been refused a license, and whether he had ever been afflicted with certain diseases, or physical disabilities. Appellant gave Bobrick an eye test, using the standard chart which hung in appellant's kitchen. Through Klementich, Bobrick asked if he couldn't have his license that evening. Appellant responded in the negative and indicated that he must return on another night. No test was given Bobrick as to his knowledge of traffic laws nor was he required to demonstrate his driving ability. Prior to the interview, the investigators had given Bobrick the sum of $70 in marked bills, the numbers of which had been recorded. From this money Bobrick gave appellant $20, in the form of a ten and two fives, which appellant placed in his pocket. Bobrick was told to return in a few days to receive his license.

Bobrick returned to appellant's residence in the company of Klementich on the evening of April 29, 1957. During both interviews, radio equipment was strapped to Bobrick's body, and by this device the conversations within the house were overheard by the investigators who were sitting with a radio receiver in a car parked a short distance from appellant's residence. After entering the house, Bobrick observed appellant fill out the application form. At appellant's direction, Bobrick placed his thumb print thereon. Appellant then gave Bobrick a temporary license, whereupon Bobrick said aloud, in English, "Thank you, Mister" which was a prearranged signal to inform the investigators that the deception had been successful and the illegal transaction completed. The investigators left the vehicle and approached appellant's front door, just as Bobrick and Klementich were about to depart. They entered appellant's residence, and informed appellant that he was under arrest. The investigators displayed their identification cards and badges to appellant, and placed appellant under restraint.

During their search of the premises, Fitzpatrick and Beckwith uncovered a number of documents which were thereafter

admitted in evidence during the course of the trial. The investigators searched appellant's person, and found the three bills which Bobrick had given appellant on the earlier meeting. At the trial a number of witnesses testified as to the manner in which they had given the sum of $20 to appellant, obtaining a driver's license thereby, and this evidence is more than adequate to sustain the conviction as to counts I to V. The jury, however, found appellant not guilty of count I, which was based on the Bobrick transaction described above. It is appellant's theory that the trial court erred in admitting evidence seized by investigators Fitzpatrick and Beckwith ". . . for the reason that the arrest was unlawful . . . the investigators did not have the power to make an arrest as peace officers, and it was not a proper case for a citizen's arrest."

Vehicle Code, section 136, provides that investigators and other designated officers of the Department of Motor Vehicles shall have the powers of peace officers for certain specified purposes. However, it is unnecessary for us now to decide the debatable question whether this section authorized Fitzpatrick and Beckwith to make the arrest here in question in their capacity as peace officers. This is so because the evidence above recited afforded ample basis for the trial court's finding that the investigators were justified in making the arrest in their capacity as private persons. (Pen. Code, § 837; *People* v. *Ball,* 162 Cal.App.2d 465, 468 [328 P.2d 276]; *cf. People* v. *McCarty,* 164 Cal.App.2d 322, 328 [330 P.2d 484].)

The authority of a private citizen to make an arrest is spelled out in Penal Code, section 837, as follows: "A private person may arrest another: 1. For a public offense committed or attempted in his presence. 2. When the person arrested has committed a felony, although not in his presence. 3. When a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it."

In *Coverstone* v. *Davies,* 38 Cal.2d 315, 320 [239 P.2d 876], the Supreme Court construed former section 836, subdivision 1, of the Penal Code (identical in terms with present § 837, subd. 1) and expressly declared that an arrest by a peace officer was authorized ". . . when 'circumstances exist that would cause a reasonable person to believe that a crime had been committed in his presence.' " In view of the identical language employed in section 837, subdivision 1, of the Penal Code, it would appear that a

private citizen may arrest another when circumstances exist which would cause a reasonable person to believe a crime had been committed in his presence. (See also *People* v. *Score,* 48 Cal.App.2d 495 [120 P.2d 62] ; *Hill* v. *Levy,* 117 Cal.App.2d 667 [256 P.2d 622].)

Without question, the evidence above recited is more than adequate to sustain the trial court's implied determination that there was probable cause for the investigators' actions. They had every reason to believe that when their decoy, Bobrick, gave the prearranged signal, the driver's license had been given in exchange for the money paid and without the required tests. Indeed, the unusual circumstance here revealed is the jury's action in acquitting appellant on this count. However, the acquittal, or conviction, of appellant has no bearing on the legality of the arrest. As stated in *Coverstone* v. *Davies, supra,* 38 Cal.2d 315, 319: "The fact that [the persons arrested] were exonerated in the criminal proceeding has no bearing upon the legality of the arrest. (*Cf. Neves* v. *Costa,* 5 Cal.App. 111, 118 [89 P. 860] ; *Wilson* v. *Loustalot,* 85 Cal.App.2d 316, 325 [193 P.2d 127], to the effect that the finding of guilt in the subsequent criminal proceeding cannot legalize an arrest unlawful when made. The converse would appear to be equally true.)

Since it is settled that a peace officer may lawfully make an arrest for a public offense committed or attempted in his presence (Pen. Code, § 836), the critical question presented in this case is whether the acts done in the presence of the arresting officer justified the arrest being made without a warrant." The critical question is precisely the same in the instant case and must be answered in the affirmative.

The term "in his presence" is liberally construed. (See *People* v. *Lavender,* 137 Cal.App. 582, 586-589 [31 P.2d 439].) Presence is not mere physical proximity but whether the crime is ". . . apparent to the officers' senses" (*People* v. *Brown,* 45 Cal.2d 640, 642 [290 P.2d 528]). The "senses" include those of hearing and smell. (*People* v. *Bock Leung Chew,* 142 Cal.App.2d 400, 402-403 [298 P.2d 118] ; *People* v. *Chong Wing Louie,* 149 Cal.App.2d 167, 169-170 [307 P.2d 929].) Moreover, a public offense may be committed in an officer's presence when his auditory perception is effected by an electronic device. (*People* v. *Bradley,* 152 Cal.App.2d 527, 532 [314 P.2d 108].)

Although the argument is somewhat loosely stated, the substance of appellant's second contention is that the trial

court erred in permitting the prosecution to ask defendant, on cross-examination, whether on occasions other than those charged he had accepted bribes in connection with applications for drivers' licenses. (See *People* v. *Farnell*, 156 Cal. App.2d 393, 400 [319 P.2d 749].)

Among the documents seized on the occasion of appellant's arrest was a loose-leaf calendar on which in his handwriting were numerous names and figures indicating that he had used it as an appointment memorandum. Appellant testified in his own behalf and was extensively questioned by his counsel with reference to the notations on the calendar. He testified that he had used it from time to time to record the results of qualifying examinations given to applicants at his home. On his direct examination, he identified several names on the calendar other than those of the persons mentioned in the information. He explained that the numerals below the names indicated the results of eye tests administered to such persons. He also testified from the calendar concerning the results of eye tests which he had administered in connection with the applicants named in the information. He categorically denied receiving from these applicants the sums which they previously had testified they paid appellant. Again on cross-examination appellant unequivocally stated that he had never taken anything in excess of the statutory fee from any applicant.

On cross-examination, and without objection from appellant, the deputy district attorney further questioned appellant with respect to other names that appeared on the calendar, eliciting the fact that he had examined the named persons in his home in connection with their applications for licenses. However, at a later stage in the cross-examination, appellant's counsel interposed the objection that a similar question exceeded the scope of the direct examination. This objection was overruled and the prosecutor continued to question appellant concerning his dealings with a number of other applicants. All of appellant's answers were to the effect that his transactions were regular and proper in every respect.

Thereafter, the district attorney was permitted, over appellant's objection, to ask appellant whether he had accepted the sum of $20 from each of four persons whose names appeared on the calendar but who were not parties to any of the transactions charged in the information. In each instance, appellant categorically denied accepting any sum in excess of the lawful fee.

In the course of an argument in chambers relating to appellant's objection, the district attorney contended (1) that appellant had opened the door to this line of cross-examination by testifying on direct concerning his dealings with various of the persons whose names appeared on the calendar, and (2) that it was proper for the prosecution thus to elicit proof of other similar offenses in order to show a common plan, scheme or design. The district attorney further indicated that the four persons referred to in the questions propounded to appellant were in court, and that he intended to call them in rebuttal to impeach appellant's testimony denying that he had taken $20 from each of them. Later, however, the prosecutor announced that he would rest the People's case without calling these witnesses in rebuttal.

There is some logic in the argument that appellant opened the door to the cross-examination of which he now complains by testifying on direct concerning several of the same series of transactions. However, for the purposes of this appeal we may assume the correctness of appellant's contention that the cross-examination exceeded the scope of the direct and transgressed the limitations set in *People* v. *McCarthy,* 88 Cal.App.2d 883, 888-889 [200 P.2d 69], and other decisions therein discussed. As we shall later point out, a holding that there was error in this respect would not justify a reversal.

Appellant further argues that the failure of the prosecutor to call the available witnesses in rebuttal demonstrates that the cross-examination with reference to appellant's dealings with such witnesses was conducted in bad faith. We cannot agree. Assuming that the testimony of these witnesses would have impeached appellant and would have tended to prove him guilty of other similar crimes, such testimony would have been objectionable. It has been held that impeaching testimony of this character introduced in rebuttal after the defense has rested puts a defendant at an undue disadvantage. (*People* v. *McCarthy, supra,* 88 Cal.App.2d 883, 888; *People* v. *Rodriguez,* 58 Cal.App.2d 415, 418-419 [136 P.2d 626]; *People* v. *Schmitz,* 7 Cal.App. 330, 360-361 [94 P. 407, 419, 15 L.R.A. N.S. 717].) Therefore, if the prosecutor had called these witnesses, and if they had impeached appellant's self-exonerating testimony, undoubtedly we would have been presented with a much more serious assignment of error than that which now confronts us.

We hold that the assumed error to which we have alluded in connection with appellant's cross-examination must be classified as nonprejudicial. The controversial questions produced answers which only reiterated appellant's protestations of innocence. More importantly, the record shows such a plethora of evidence of irregularity in appellant's procedures that it is inconceivable that any reasonable jury could have entertained the slightest doubt of his guilt. Appellant's own testimony provided an ample basis for inferences that his extraordinary procedures in processing such a large number of applications for drivers' licenses at his home and at all hours of the day and night were not followed for the purposes represented by him.

As stated in *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243]; ". . . a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." Applying the foregoing test to the record before us, we are of the opinion that it is not reasonably probable that a result more favorable to the appellant would have been reached in the absence of the error of which complaint is here made. If we entertained any doubt on the subject we would be constrained to give appellant the benefit of it. (*People* v. *Campbell,* 162 Cal.App.2d 776, 787-788 [329 P.2d 82]; *People* v. *Gibson,* 165 Cal.App.2d 685, 689-690 [332 P.2d 113].)

The judgment and order denying new trial are affirmed.

Fox, P. J., and Ashburn, J., concurred.

A petition for a rehearing was denied May 25, 1959, and appellant's petition for a hearing by the Supreme Court was denied June 24, 1959. Schauer, J., was of the opinion that the petition should be granted.