[Crim. No. 3933. First Dist., Div. One. May 5, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. HAROLD
LLOYD GARNER, Defendant and Appellant.

Harold Lloyd Garner, in pro. per., and Michael V. McIntire, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Robert R. Granucci, John F. Kraetzer and Albert W. Harris, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—On November 16, 1960, defendant appealed from his conviction on November 9, 1960, of two violations of section 464 of the Penal Code, burglary with explosives, following a jury trial. After proceedings regularly taken to that end, the appeal was dismissed for failure to file an opening brief and a remittitur issued November 6, 1961.

On December 10, 1963, defendant filed a petition for habeas corpus with the State Supreme Court alleging as a ground of illegal confinement, among others, a denial of representation by counsel on appeal. (*Douglas* v. *California*, 372 U.S. 353 [83 S.Ct. 814, 9 L.Ed.2d 811].) On January 22, 1964, the petition was transferred to this court, and the following day the dismissal was vacated, the remittitur was thereupon recalled and counsel was appointed to represent defendant on the reinstated appeal. A subsequent motion by the People to vacate the order which vacated the dismissal was denied.[1]

Defendant assigns as error the admission into evidence of incriminating statements which he alleges were secured from him in violation of his constitutional rights (1) because he was illegally arrested, (2) because he was not promptly arraigned, and (3) because they were elicited under circumstances which fail to satisfy recently enunciated criteria for their admission. He further contends that his right to be free from unreasonable search and seizure was violated by the manner in which photographs were taken of his truck and the manner in which his trousers were secured from his home, and that, therefore, the use of evidence thereby obtained was error.

The circumstances giving rise to the defendant's arrest and

---

[1]The question of the retroactive application of the rule of *People* v. *Dorado* (1965) 62 Cal.2d 388 [42 Cal.Rptr. 169, 398 P.2d 361] to the facts of this case has not been presented, but it is noted that if the petition for the writ of habeas corpus, rather than the reinstated appeal, were before the court the defendant would be unable to assert any

the events of which complaint is made began on July 4, 1960, when an employee discovered that the offices of Conway Motors in Concord had been burglarized. The safe had been cut by an acetylene torch and the fire clay insulation around the lock had been removed. Money and savings certificates were taken from the safe. Cabinets in the body shop had been broken into and rifled of tools.

On Saturday, July 9, 1960, the owner of McFetridge Buick in Walnut Creek discovered that the safe in his office had been cut open with an acetylene torch, and that cash had been taken from the cash box and a cigarette machine. The same day a disinterested witness furnished the Walnut Creek Police Department with the license number of a pickup truck which had been parked near the scene of the crime between the hours of midnight and 1:30 a.m. The registered owner of this truck had entered into an agreement to sell it to defendant, and had delivered possession to the defendant on June 28, 1960.

Lieutenant Thompson of the Walnut Creek Police Department contacted the registered owner's partner, and, as was shown out of the presence of the jury, apparently armed with the information that defendant had purchased the car, talked with defendant's parole officer who authorized the lieutenant to arrest the defendant for investigation of parole violation for purchasing a vehicle without permission, for quitting his former employment, and for keeping late and unusual hours. This authorization was confirmed in writing following defendant's arrest on Monday, July 11. (See Pen. Code, § 3056.)

On July 11 the lieutenant and another officer questioned defendant at his new place of employment in Berkeley. He admitted that he had purchased the pickup truck late in June without advising his parole officer;[2] and he showed the officers the truck which bore the reported license number. Thereupon the officers took the defendant into custody and returned to

alleged violation of the specific rights recognized in *Massiah* v. *United States* (1964) 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246], and *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977] and vitalized in this state by *Dorado*. (*In re Lopez* (1965) 62 Cal.2d 368, 372 [42 Cal.Rptr. 188, 398 P.2d 380]; *In re Lessard* (1965) 62 Cal.2d 497, 512 [42 Cal.Rptr. 583, 399 P.2d 39]; *In re Shipp* (1965) 62 Cal.2d 547, 549 [43 Cal.Rptr. 3, 399 P.2d 571].) In short, the indigent defendant deprived of counsel anomalously finds himself possessed of more shafts in his quiver that would have been the case had he been able to afford to properly arm himself in the first instance. To the same effect see *People* v. *Benavidez* (1965) 233 Cal.App.2d 303 [43 Cal. Rptr. 577].

[2] The reference to the parole officer was stricken upon objection being made by defendant, and the jury were instructed to disregard it.

the Walnut Creek Police Department. At the police station he was questioned concerning his activities on the nights of July 8 and 9. He stated he worked on a truck in the evening at the Danville Garage and then returned home. The officers then went to the Garner residence, identified themselves, questioned Mrs. Garner concerning the defendant's activities on the night in question, and requested and were given a pair of khaki pants which Mrs. Garner stated the defendant had been wearing on the night of July 8. Particles found in these trousers were subsequently identified as similar to the insulation in the safe at McFetridge Buick.

The lieutenant again talked to the defendant at lunchtime on July 11, again during the afternoon and finally at 4 or 4:30 when he was taken to the county jail. He was again interviewed on the 12th for about 15 minutes. In all of the conversations of the 11th and 12th he denied any involvement in the incidents in question.

Meanwhile, the husband of defendant's sister-in-law investigated some boxes which the defendant had left on his premises on July 3. On finding that they contained tools, rather than household goods as represented, on July 12 he notified the police. On the 13th the lieutenant came and picked up the tools. They were subsequently identified as from Conway Motors. On the 11th or 12th, the owner of the Danville Garage advised the police that he had left the defendant at the garage between 11:30 and midnight on the 8th, and that the next morning defendant stated that he fell asleep about midnight and didn't get any work done, and that his wife woke him up about 7 a.m. and he went home.

Defendant sent for the lieutenant on the 13th, and the latter went to the county jail on getting the message after returning with the stolen tools. At this time defendant related the details of the commission of the McFetridge offense. The lieutenant then advised the defendant that he had just returned from his brother-in-law's, and that he believed Garner was involved in another burglary in Concord. Defendant then, at the request of the lieutenant, recited his activities in connection with that burglary. Thereafter, defendant was taken to the district attorney's office and a stenographic record of his statement, which was later introduced into evidence, was made.

Further details concerning the foregoing and additional statements made by the defendant, as reflected in the evidence introduced at the trial, are set forth below.

The defendant did not testify in his own behalf, either on the merits of the case or on *voir dire,* on the issue of whether his inculpatory statements were free and voluntary. After each side had rested and argued to the jury and before the court instructed the jury, the defendant moved to open up his case in chief so that he could testify. The motion was denied. No offer of proof was made in connection with the motion and the nature of the testimony which defendant desired to produce is left to conjecture and speculation. The matter was not pressed on motion for new trial nor by defendant personally when arraigned for judgment.

### The Alleged Violation of Defendant's Dorado Rights

After the case was tried and after appellant's opening brief was filed the requirements for admissibility of incriminating statements were elaborated on and restricted as set forth in *People* v. *Dorado* (1965) 62 Cal.2d 338, 353-354 [42 Cal.Rptr. 169, 398 P.2d 361], wherein it is stated that a "confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights." (Pp. 353-354.)

Defendant's statements in the record must be assayed by those reagents. First, it may be pointed out that with the exception of the initial interview, and regardless of whether his detention be termed an "arrest" or a "return to custody" (hereinafter discussed), all of the statements were made while he was in actual custody.

At the time of the initial interview no warning was given defendant of his right to counsel or his right to remain silent. Reasonable minds could differ as to what extent the investigation had progressed from a general inquiry into one focusing on the defendant. So far as appears from the record all that the officers knew at that time was that defendant, a paroled felon, reportedly had some two weeks before acquired a truck which had been observed at the scene of a burglary. Before doing anything at all the officers undertook to verify the information they had. It was only after defendant admitted the purchase, ownership, and possession of the truck that he was taken into custody. It is concluded that these ad-

missions were made prior to the time that investigation had focused on defendant, and that although the nature of the interrogation was such that it could elicit statements which might be either incriminating or explanatory, it was not part of a process aimed at securing the former. There being a lack of three of the elements referred to there was no occasion to admonish this suspect of his right to counsel and to remain silent. (See *People* v. *Modesto* (1965) 62 Cal.2d 436, 446 [42 Cal.Rptr. 417, 398 P.2d 753] (defendant's first statements); *People* v. *Dorado, supra,* 62 Cal.2d 338, 354 [42 Cal.Rptr. 169, 398 P.2d 361]; *People* v. *Campbell* (1965) 232 Cal.App.2d 712, 714 [43 Cal.Rptr. 71]; *People* v. *Mora* (1965) 232 Cal.Rptr.400, 406 [42 Cal.Rptr. 725] (prearrest statements).)

Thereafter he was interrogated on the way to the Walnut Creek Police Station and again after his arrival. At this time and at all times thereafter the defendant was in custody, and it may be assumed that the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on defendant. (See *People* v. *Stewart* (1965) 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].)[3]

There is evidence to indicate that defendant was advised of his rights. By cross-examination it was brought out that defendant had been advised of his right to counsel throughout the various interviews.[4] It further appears that he at no time indicated a desire for counsel until just before his arraignment. On the question of his right to remain silent

[3]Since *Stewart* predicates its conclusion that ''focus'' automatically follows ''arrest'' on the principle that arrest requires reasonable cause for believing the person committed the offense, the conclusion may possibly be qualified when the premise on which it is based is not present. As hereinafter set forth there is a ''custody'' which is less than ''arrest'' in the case of a parolee, and the interests of society may well dictate such custody pending investigation on circumstances short of reasonable cause for arrest. There is also present herein the suggestion that a person may be held in ''focus'' on one crime and be in custody for it, and still be only subject to a general inquiry in regard to another offense.

[4]This testimony is as follows: ''Q. Had you advised the defendant on the 12th that he had a right to counsel? A. Absolutely. Q. Did you advise him that he had no—— that he need not talk to you if he didn't want to? A. I don't recall specifically telling him that, but certainly no one has to talk to me if they don't want to. Q. Lieutenant, on the 13th, did you advise the defendant that he had right to counsel? A. I don't recall specifically. He had been advised of that throughout the various interviews I had with him. He knows that.'' (See also *People* v. *Dorado* (1965) 62 Cal.2d 338, 355 fn. 9 [42 Cal.Rptr. 169, 398 P.2d 361] as to Contra Costa County practice; and compare *People* v. *Stewart* (1965) 62 Cal.2d 571 at p. 581 [43 Cal.Rptr. 201, 400 P.2d 97].)

the record reflects, in addition to the passage referred to in the last footnote, that the defendant acknowledged at the con-conclusion of the statement given to the district attorney on July 13 that he had known all along that he had the right not to make a statement, and that he had understood that anything he said could be used as evidence against him.[5] The foregoing appears to cleanse the statements referred to of any tarnish. The defendant having been effectively informed of his right to counsel, and being cognizant of his right to remain silent, waived those rights.

The evidence reflects that up until an interview requested by the defendant on the afternoon of July 13, the defendant continually denied any involvement in the McFetridge burglary which was apparently the only one discussed up to that time. The inquiries were directed to ascertaining his activities on the night of July 8,[6] and he was not asked to confess.[7] The time spent on interrogation on July 11 was

[5]The colloquy is as follows: "Q. You realize you have—— you have known, have you not, that all along that you have the right not to make a statement if that is your desire? A. Yes, sir. Q. You understand that anything that you say, and you have understood that anything you say can be taken down and used as evidence against you? A. Yes, sir."

[6]The following allegedly was elicited after arrival at Walnut Creek: "A. Well, I asked Mr. Garner what his activities had been recently, what he had been doing, where he had been employed. He told me that he had been employed at the Shephard Cadillac Agency in Oakland until Friday, July the 8th, 1960, that he had quit that evening to accept employment at the Dana Auto Center. I asked him what he had been doing with his evenings. He stated that he lived in Danville at the present time, at 155 Gilblast Road in Danville, and that evenings he had been working on a friend of his. a Mr. Wayne Bolerstein's pickup truck. Mr. Bolerstein is the owner of the Danville Garage in Danville.

"I asked him what he had done on the evening of Friday, July the 8th, 1960. He stated that after quitting his job at Shephard Cadillac, that he had stopped by the Dana Auto Center, had talked to the boss there, and then proceeded to his home in Danville. He had stated he had his supper and that he had then returned to the Danville Garage and that he had .done some work on Mr. Bolerstein's pickup truck, and that he had later returned home. Q. I see. Did he indicate about—— What time did he allege that he had gone home? A. At that time—— I don't recall what time he stated he got home that night. Q. I see. And following this, did he say anything further in regard to this matter? A. No, at this time I told him that I would go out and talk to Mr. Bolerstein, and at this time that's what I did."

[7]The officers had the clairvoyance which has been denied to an accused. (Cf. *People* v. *Stewart* (1965) 62 Cal.2d 571, 576 [43 Cal.Rptr. 201, 400 P.2d 97].) The record shows: "Q. Were you asking him continually to confess on the 12th? A. Certainly not. Q. Were you asking him on the 11th during the time that you had seen him three or four times between 8:15 and——a.m. and 4:00 p.m. on the 11th to continually confess? A. No, I was just asking him what his activities were for the evening of Friday, July the 8th, 1960. Q. Isn't it true actually that you had told him that he better confess? A. That is not true."

about 25 minutes en route to Walnut Creek; 15 to 20 minutes at the police station; a few minutes at noon; 10 to 15 minutes at 1 p.m. at which time the defendant was requested to and did write down an account (not used at the trial) of what he had done on the evening of July 8, 1960; and 20 to 25 minutes in the later afternoon en route to the county jail at Martinez. There is nothing in the record as to the nature of these conversations except as has been indicated above.

On Tuesday, July 12, the lieutenant interviewed the defendant for about 15 minutes and allegedly advised him " 'Well, we've tried to substantiate this, and it doesn't appear to me to be the truth. Now, if you want to change this or if you want to talk to me about this, please call me.' "

█ Whether or not the statements secured while defendant was in custody up to this point were elicited by a process that lent itself to eliciting incriminatory statements depends on "the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances. (*People* v. *Stewart, supra,* at p. 579.) █ Analysis of these factors is rendered unnecessary because defendant had been advised of his right to counsel. Furthermore, the statements introduced concerning defendant's account of his activities were in no sense confessions or admissions, and if incriminatory were only so in the light of other evidence pointing to their falsity. In the absence of any prejudice defendant cannot predicate error on their admission. (See *People* v. *Dorado, supra,* 62 Cal.2d 338, 356; and see *People* v. *Campbell* (1965) 233 Cal.App.2d 38, 48-49 [43 Cal.Rptr. 237]; *People* v. *Campbell, supra,* 232 Cal.App.2d 712, 715; *People* v. *Herrera* (1965) 232 Cal.App.2d 561, 563 [43 Cal.Rptr. 14]; *People* v. *Soto* (1965) 232 Cal.App.2d 437, 444 [42 Cal.Rptr. 799]; *People* v. *Finn* (1965) 232 Cal.App.2d 422, 426-429 [42 Cal.Rptr. 704]; *People* v. *Jones* (1965) 232 Cal.App.2d 379, 391-392 [42 Cal. Rptr. 714]; *People* v. *Ghimenti* (1965) 232 Cal.App.2d 76, 82-84 [42 Cal.Rptr. 504]; *People* v. *Ulibarri* (1965) 232 Cal. App.2d 51, 55-56 [42 Cal.Rptr. 409]; but compare *People* v. *Burns* (1965) 232 Cal.App.2d 587, 589 [43 Cal.Rptr. 84].)

That evening the defendant's sister-in-law's husband notified the Walnut Creek police of the presence of the boxes on his premises at San Leandro, and they were picked up by the police the next morning.[8] On returning to Walnut

---

[8] Why the custodian in San Leandro telephoned the police in Walnut Creek is left to conjecture. Defendant's assumption that information was illegally elicited from defendant is hereinafter discussed.

Creek the investigating officer went to see defendant at the county jail at Martinez at his request. The defendant asked if he admitted the McFetridge robbery could he be paroled to a local police officer, and the officer indicated he could not.[9] A few minutes later he volunteered that all the previous information about his activities was false and " '[W]ell, I might as well get this straightened out. I did commit the burglary of the McFetridge Buick Company.' " In response to the officer's request " '[W]ill you tell us about it?' ", he proceeded to relate the details. Upon completion of this narration, the officer advised defendant that he had been to San Leandro and felt Garner was involved in the Concord burglary. The latter then admitted his responsibility,[10] and proceeded to recount his activities.

The prosecution's case is now well near foundering. The Scylla of custody, the Charybdis of focus have now been augmented by the shoals engendered by full confessions in response to simple questions designed to elicit them. Are there any factors or circumstances which will buttress the fragile reed of advice to defendant on which the People must otherwise rely to float their conviction to a safe haven?

In *In re Schlette* (1965) 232 Cal.App.2d 407 [42 Cal. Rptr. 708], the court elected to dispose of a collateral attack predicated on the *Dorado* doctrine on its merits (cf. *In re Lopez, supra,* 62 Cal.2d 368). The record reflected that the

---

[9]The testimony is: "THE COURT: What did he say and what did you say at that time? THE WITNESS: From the beginning—— THE COURT: From the best of your recollection. Now, he said so and so, and you said so and so. THE WITNESS: Right. He asked me—— It was asked if I had promised him anything and I said absolutely not. And it was asked if he had made any mention of promises. Well, he had asked if it would be possible, if it was within our power to even discuss the possibility that if he admitted the McFetridge burglary in Walnut Creek, that he could do county time or that he could be paroled to my partner. He didn't want to be paroled to me, but to my partner, Sergeant Queen. And I told him this was ridiculous, because—— and the words are, that he is under the authority of the California Adult Authority, that this was completely not within my power, that I can't be involved in promises at all. And that was it.''

[10]The record reflects: "Now, at this time I told him, I said 'Mr. Garner, do you know a Bob Fernandez?'

" 'Yeah, it's my brother-in-law.'

"I advised him that I had just come from his brother-in-law's residence in San Leandro. And I said, 'Now, is there anything else you'd like to tell me?' And he said, 'Well, regarding what?' And I said, 'Well, now, Mr. Garner, I feel like you're involved in another burglary in Concord. Now, you've told me about one. If you're responsible for this other one, tell me about it.' He said, 'All right, I'm responsible.' I said, 'Well, will you tell me what happened?' ''

defendant had been offered opportunities to call off the interrogation, and to contact his attorney, but that he stated he did not want an attorney. The court concluded as follows: "The quoted excerpt from *Escobedo* v. *Illinois, supra,* inferentially dispenses with a police warning of the right to remain silent when the defendant is already aware of that right. Implicit also is the notion that the right to counsel may be waived by one who knows what he is doing. At footnote 14 (12 L.Ed.2d at p. 986) the majority in *Escobedo* expresses what is already implicit: 'The accused may, of course, intelligently and knowingly waive his privilege against self-incrimination and his right to counsel either at a pretrial stage or at the trial. See *Johnson* v. *Zerbst,* 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357].'

"Like *Escobedo,* the *Dorado* decision recognizes that the police warning is a superfluity when the suspect already knows his rights. It permits evidentiary use of the incriminating statement where there is a knowing waiver of the right to remain silent and of the right to counsel. Thus the majority opinion states: 'In the absence of evidence that defendant already knew that he had a right to counsel during interrogation, the failure of the officers to inform him of that right precludes a finding that he knowingly waived it. . . . Such waiver presupposes knowledge of the right to remain silent; in the absence of evidence of such knowledge, the waiver requires a warning to the accused of that right.' (*People* v. *Dorado, supra,* 62 Cal.2d at p. 352; see also, page 349, fn. 5.)

"Schlette's confession was not a product of ignorance of his right to silence or of denial of his right to counsel. The evidence, including his own testimony, demonstrates that before and during the interrogation in the sheriff's office during the night of March 9 he was fully aware of these rights. Their expression in the form of a police warning was thus superfluous. Far from demanding an attorney, Schlette said he didn't want one. He knowingly waived his right to silence and his right to counsel. (Cf. *People* v. *Sigal,* 221 Cal.App.2d 684, 702-703 [34 Cal.Rptr. 767].)

"In determining whether a waiver is 'intelligent' as well as 'knowing,' the circumstances of the interrogation and the suspect's capacity to understand the consequences of his actions are factors. (Cf., *In re Johnson,* 62 Cal.2d 325 [42 Cal.Rptr. 228, 398 P.2d 420], filed Jan. 28, 1965.) Schlette's interrogation was a fencing match, not a third degree grill-

ing. The immediate impetus for his confession was not police questioning but his telephone conversation with his mother. Earlier, he had attempted to barter a confession in return for promises as to his own disposition and that of his son. Although these offers were rejected, he made an attempt retroactively to characterize his confession as a barter arrangement. These efforts demonstrate a high degree of awareness and self-command. The conversations in the sheriff's office and Schlette's own trial testimony supply evidence of intellectual capacity more than adequate for comprehension of his own predicament and of the consequences of his statements. His subsequent history corroborates this estimate of his intelligence. [There follows reference to writs sought by Schlette.] We hold that his waiver was both knowing and intelligent. His confession and the circumstances under which it was given amply satisfy the admissibility standards pronounced in *Escobedo* v. *Illinois* and *People* v. *Dorado.*'' (232 Cal.App.2d pp. 411-413.)

So here it is concluded in view of the termination of any prior process of interrogation, the evidence concerning the warnings to defendant, his general appreciation of his situation, and his attempts to barter with the officers, that there was a knowing and intelligent waiver of his right to counsel and to remain silent. His confessions therefor were properly received.

 There remains for consideration the subsequent statements of defendant. The confessions were immediately repeated to the district attorney in the presence of a stenographer. Where as here, there has been a waiver no reason suggests itself why it should not cover subsequent repetition of the same incriminating statements. There is no substantial elaboration in the scope of the statements insofar as the elements of the crime are concerned as was the case in *Modesto* (see 62 Cal.2d 436, 446-447; and cf. *People* v. *Campbell, supra,* 233 Cal.App.2d 38, 46, where note is made that the admissions in question were already properly before the court by other testimony). At some time during his confinement (from the content apparently after the statement given in the district attorney's office and before his arraignment), defendant was interviewed by his parole officer. In response to defendant's question as to whether he should hire an attorney, he was told that such was his legal right. He asked the parole officer his feelings about whether he would be able to get a county jail sentence and have the Walnut Creek officer as his parole officer, and was told that it was

impossible. In the course of this interview he admitted that he had committed two acts of burglary. This conversation merely corroborates that defendant, with knowledge of his rights, was attempting to bargain with the authorities and as such is either beyond the scope of *Dorado* or within the waiver therein recognized.

The statement defendant made to the lieutenant on his way to his arraignment[11] was not incriminating but merely serves to show that he was aware of his right to counsel.

The statement by the defendant in the course of casual conversation with his custodian while going to and from his arraignment that "he had committed it [the burglary] because he needed money" can in no sense be deemed a product of a process of interrogation. (*People* v. *Ghimenti, supra,* 232 Cal.App.2d 76, 83-84.)

One statement, however, was given after his arraignment, and following the appointment of, but before consultation with his appointed attorney. In this conversation he again detailed his activities in connection with the Conway Motors burglary for a representative of the Concord Police Department. Except for the fact that an attorney had been appointed, this statement would appear to be admissible as a repetition of what had twice gone before. (See *People* v. *Modesto, supra,* 62 Cal.2d 436, 446-447 (second statement).) Defendant acknowledged to the Concord officer, apparently contrary to fact, that he had talked to his attorney and on his advice could not elaborate further than he did. These statements and the total situation, as it had developed to that time, indicate that defendant consciously waived his rights to silence and to consult with his appointed counsel before this repetition of his confession.

Defendant in addition to the foregoing persists in the contention originally presented at the trial that all the evidence is a product of illegal arrest and detention. An examination of these questions reflects no error.

---

[11]The testimony is: "A. Well, it was a very brief conversation. Previously, on the afternoon of the 13th, when he had—— was present in your office, he had indicated that he possibly—— that he didn't want an attorney, that he wanted to go ahead with this thing and indicated that he wanted to expedite, and possibly wanted to take the stand at his preliminary hearing. So it was arranged that if he desired to do this, that his preliminary could be held the next day. Well, that afternoon when he arrived at the Walnut Creek Municipal Court, I talked to him. And he said at this time—— He said, 'I don't know what I should do. I think that I should be represented; I should have some counseling.' And I said, 'Well, I certainly agree with that.' "

### The Alleged Illegality of Defendant's
### Return to Custody

Defendant attacks the legality of his arrest and argues that since it was unlawful it was error to admit into evidence any statements made by him while so confined and any property seized presumably as a result of leads developed during such illegal detention. (See *Wong Sun* v. *United States* (1962) 371 U.S. 471, 484-488 [83 S.Ct. 407, 9 L.Ed.2d 441]; *People* v. *Mickelson* (1963) 59 Cal.2d 448, 449-450 [30 Cal.Rptr. 18, 380 P.2d 658]; and *People* v. *Macias* (1960) 180 Cal.App.2d 193, 195-199 [4 Cal.Rptr. 256].)

Defendant admittedly suffered four prior convictions and was on parole at the time of his apprehension. The record reflects that those responsible for his parole authorized and directed his return to custody orally and in writing, and that reasonable grounds existed for investigating his activities. That the defendant as a paroled prisoner had limited rights and was subject to being returned to custody cannot be questioned. (See Pen. Code § 3056; *People* v. *Hernandez* (1964) 229 Cal.App.2d 143, 148-151 [40 Cal.Rptr. 100]; *People* v. *Goss* (1961) 193 Cal.App.2d 720, 724-726 [14 Cal.Rptr. 569]; and *People* v. *Denne* (1956) 141 Cal.App.2d 499, 507-510 [297 P.2d 451].) He asserts, however, that the right to return him to custody can only be exercised by his parole officer, citing *People* v. *Hen Chin* (1956) 145 Cal.App.2d 583 [303 P.2d 18]. It is therein suggested that although a local police officer knows that a parolee is wanted for failure to report to his parole officer, he cannot by virtue of that fact alone arrest him and search his room. (145 Cal.App.2d at p. 584, fn. 2, and p. 585, fn. 6; and see *People* v. *Gallegos* (1964) 62 Cal.2d 177, 178-179 [41 Cal.Rptr. 590, 397 P.2d 174]; *People* v. *Hernandez, supra,* 229 Cal.App.2d at p. 147, fn. 2.) It is unnecessary to determine the weight to be given the comment because neither it nor the latter cases refer to the situation where the parole officer, as here, had authorized and directed the return of the parolee to custody pending investigation of possible parole violation.

Defendant further asserts that in any event the City of Walnut Creek police officers from Contra Costa County had no authority to take a person into custody in the City of Berkeley in Alameda County. The authority cited, and others, indicate that at common law a sheriff, and for that matter a constable, or police officer, can only act officially within the territorial jurisdiction which he serves. (44 Cal.Jur.2d, Sher-

iffs, etc., § 55, p. 706; and see 47 Am.Jur., Sheriffs, etc., § 29, p. 842; 80 C.J.S., Sheriffs, etc. § 36, p. 205; 62 C.J.S., Municipal Corporations, §§ 565 and 574, pp. 1074, 1108; 5 Am.Jur. 2d, Arrest, § 50, p. 742; 6 C.J.S., Arrest, § 12b(2), pp. 609-610.) Insofar as the execution of criminal process is concerned it has been held that a peace officer designated by statute (see Pen. Code, §§ 816 and 817) may arrest outside of the county (*Allen* v. *Napa County* (1889) 82 Cal. 187, 188-190 [23 P. 43]). The question of whether an extraterritorial arrest without a warrant is proper has been raised in several cases, but has been left undecided because of circumstances in each case which would have justified an arrest by a private citizen. (*People* v. *Alvarado* (1962) 208 Cal.App.2d 629, 631 [25 Cal.Rptr. 437]; *People* v. *McCarty* (1958) 164 Cal. App.2d 322, 328 [330 P.2d 484]; and *People* v. *Ball* (1958) 162 Cal.App.2d 465, 468 [328 P.2d 276]; and see *People* v. *Burgess* (1959) 170 Cal.App.2d 36, 40 [338 P.2d 524].) It is questionable whether a representative of the Adult Authority, in the absence of a present necessity for assistance in effecting an arrest (see Pen. Code, § 839), could deputize a private citizen to place a parolee in custody. The facts of this case, however, in that they reflect oral authorization buttressed by a written order on the day of defendant's return to custody, which was the first ensuing business day, suggest that the police officers should have the same power to act as if they were armed with process.

 Even if the arrest was illegal the defendant must show that the incriminating statements resulted from the illegal detention. The matter is analogous to the situation where the admission or confession is elicited during a period where the defendant's right to prompt arraignment is violated. (See *Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 9-11 and cases cited *infra,* p. 21 [291 P.2d 929].) The matter is reviewed extensively in *People* v. *Freeland* (1963) 218 Cal. App.2d 199 [32 Cal.Rptr. 132], wherein the court rejected the contention that the confession was inadmissible per se because of an illegal arrest, and examined the facts and found it voluntary. (See also *People* v. *Hanson* (1961) 197 Cal. App.2d 658, 664 [17 Cal.Rptr. 334].)

Furthermore, unless defendant can show that prejudicial admissions, which directly implicated him or led to the discovery of further evidence, were made between the time he was allegedly improperly taken into custody, and his custody was validated by the written order of the Adult Authority,

there is no basis for excluding evidence. (*People* v. *McCarty*, *supra*, 164 Cal.App.2d 322, 329.) The only statements in the record which were made at this period of time are, first, a conversation concerning defendant's purchase and ownership of the truck which were elicited prior to and not after the time he was taken into custody; and defendant's narration of his activities on the evening of July 8 as given at the Walnut Creek Police Station. The former merely related to facts established independently by the prior owner of the car which were known to the officers at the time, were never controverted by defendant, and were established by independent evidence at the trial. The latter statement only prejudiced defendant insofar as the facts failed to corroborate his statements. It did not contain anything that could be construed as an admission of any element of the crime involved, nor did it in any sense lead to the discovery of any evidence which would not be available by ordinary investigation at his home or place of supplementary employment. If it is assumed the statements are the fruit of an illegal arrest, and should be expunged from the record, it is inconceivable that a different result would have obtained. There is, therefore, no prejudice to defendant in any event.

### The Delay in Arraignment

Defendant further complains that the incriminatory statements attributed to him and certain physical evidence were improperly admitted because they were the fruit of his detention without arraignment. He was held in custody from Monday morning, July 11, and not charged and arraigned until Thursday morning, July 14. As suggested above in connection with the taint of the alleged illegal arrest, California does not follow the federal rule of absolute rejection of evidence produced during a period of illegal detention. (*Rogers* v. *Superior Court, supra*, 46 Cal.2d 3, 9-11; *People* v. *Hall* (1964) 62 Cal.2d 104, 108, fn. 6 [41 Cal. Rptr. 284, 396 P.2d 700]; *People* v. *Imbler* (1962) 57 Cal.2d 711, 717 [21 Cal.Rptr. 568, 371 P.2d 304]; *People* v. *Garner* (1961) 57 Cal.2d 135, 141-142 [18 Cal.Rptr. 40, 367 P.2d 680]; *People* v. *Van Eyk* (1961) 56 Cal.2d 471, 480 [15 Cal. Rptr. 150, 364 P.2d 326]; *People* v. *Kendrick* (1961) 56 Cal.2d 71, 85 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Gauthier* (1962) 205 Cal.App.2d 419, 425 [22 Cal.Rptr. 888]; and *People* v. *Williams* (1960) 187 Cal.App.2d 143, 152 [9 Cal. Rptr. 540].)

*People* v. *Goss* (1961) 193 Cal.App.2d 720 [14

Cal.Rptr. 569], indicates (pp. 724-725) that a parolee held for the Adult Authority while a new charge is being investigated is not entitled to prompt arraignment and speedy trial on that charge as provided in the Constitution and laws of this state. This broad conclusion is questioned in *People* v. *Hernandez, supra,* 229 Cal.App.2d 143, 150, and it may be assumed for purposes of this case that prosecution of a new charge ''should be accompanied by the procedural safeguards and guaranties attending criminal prosecution generally'' with due regard, however, to the status of the parolee and the right of those responsible for him to control his custody. *People* v. *Imbler, supra,* implies that the fact that a defendant is in custody awaiting sentence on a charge to which he has pled guilty will not excuse failure to arraign on a new charge (57 Cal.2d at p. 717).[12]

Even if the last-mentioned considerations are considered as governing it still must be shown that the illegal detention directly contributed to the eliciting of the incriminatory statements. Their voluntary nature, as herein first set forth, precludes such a finding.

### The Physical Evidence

As noted above defendant has inferred that the discovery of the tools from the Concord burglary in San Leandro was in some way connected with his interrogation before his arraignment and his alleged unlawful arrest and detention. He did not take the stand and there is not a scintilla of evidence to show that the authorities learned of this evidence other than from its custodian. The latter could clearly consent to its release to the police and there is no question of unlawful search and seizure. Speculation as to how the custodian was advised to call the authorities in Walnut Creek is profitless. Such information could have come from his local police, the defendant's wife, the diligence of the Walnut Creek authorities in checking the defendant's associates and relatives, or any number of other sources than the defendant.

---

[12]It has been suggested—in argument on motion for new trial and in the petition for writ of habeas corpus filed by defendant—that the records of the Contra Costa County jail would indicate that defendant was ''booked at 5:30 p.m. on July 11, 1960 for investigation of 459 PC (Burglary).'' This statement is ambiguous in that it does not indicate whether the charge emanates from facts sufficient to hold for burglary or from facts sufficient to hold a parolee for investigation of burglary. Although immaterial in this case, it is submitted that the time within which to arraign, etc. a parolee need not begin to run until probable cause for the commission of a new offense is established.

The defendant's trousers were secured from his house with the consent of his wife. The law is that "In the husband's absence the officers could reasonably conclude that the wife could properly consent to a search of property in the home." (*In re Lessard* (1965) 62 Cal.2d 497, 504 [42 Cal.Rptr. 583, 399 P.2d 39]; and see *People* v. *Carter* (1957) 48 Cal.2d 737, 744-747 [312 P.2d 665]; *People* v. *Dunaway* (1963) 222 Cal.App.2d 322, 327-328 [35 Cal.Rptr. 154]; *People* v. *Hughes* (1960) 183 Cal.App.2d 107, 113-115 [8 Cal.Rptr. 643].) Defendant urges that the wife's consent was improperly obtained because it was represented to her he was legally arrested when in fact he was not. What has been said demonstrates the legality of his detention. Nor can it be said that she was coerced to give consent. Her claim of fear, uncommunicated to the officers, cannot invalidate the objective manifestations of consent upon which the officers relied. (See *People* v. *Guyette* (1964) 231 Cal.App.2d 460, 466 [41 Cal.Rptr. 875]; and *People* v. *Ortiz* (1962) 210 Cal.App.2d 489, 498 [26 Cal.Rptr. 677].)

Finally, it is asserted that the photographs of the truck were the product of an illegal search and seizure. The truck, however, was not seized. (Cf. *Preston* v. *United States* (1964) 376 U.S. 364 [84 S.Ct. 881, 11 L.Ed.2d 777]; and *People* v. *Burke* (1964) 61 Cal.2d 575 [39 Cal.Rptr. 531, 394 P.2d 67]; and *People* v. *Garrison* (1961) 189 Cal.App.2d 549 [11 Cal.Rptr. 398].) The truck was seen by the original informant, and by the officers. The photograph, regardless of its source, is merely demonstrative evidence given life by the testimony the same as if either witness, endowed with sufficient talent, had drawn what was observed. It is not a replica of tainted evidence. (Cf. *People* v. *Berger* (1955) 44 Cal.2d 459 [282 P.2d 509].) There was nothing untoward in the manner in which the truck was photographed. It was picked up in Berkeley at Garner's request by a friend, who voluntarily drove it by the Walnut Creek Police Department at the officer's request. There it was photographed and the friend took it to his place of business in Danville, and then to the Garner residence in the same town. Judicial notice discloses that the main route from Berkeley to Danville is such that there would be little diversion in time or space for the requested accommodation. It is obvious that the truck could have been photographed during the three or four days that it stood on the streets in Berkeley. In any event, the identity of the truck was never questioned and fully established without reliance on the photographs. No error is found.

## Defendant's Additional Contentions

The petition for writ of habeas corpus first referred to herein has been reviewed as a supplemental brief for assignment of errors, in addition to those made by defendant's able counsel. The alleged illegality of his arrest, delay in arraignment, and use of evidence illegally obtained have all been dealt with above. He further contends there was prejudicial error and misconduct in bringing out the fact that he had a criminal record through reference to his parole status; and further error in denying him the right to reopen the case to testify. Further assignments attack the constitutionality of section 464 of the Penal Code for uncertainty and the propriety of making a longer new sentence concurrent with an older shorter sentence which has been partially served.

 Defendant further suggests that his confessions were not voluntary—in the pre-*Dorado* sense—but were produced through coercion and intimidation. There is no evidence not hereinabove reviewed to support this charge. His counsel vainly tried to bring out something along this line in cross-examination, but was unable to do so. Garner did not testify, and the officer's testimony that the statements were free and voluntary is uncontradicted.[13] The jury was correctly instructed as to their duties in connection with determining whether or not any statements were voluntary. Under these circumstances as far as direct appeal is concerned, the finding inherent in the verdict and judgment that the confessions were voluntary is supported by the evidence detailed above. The same circumstances indicate that the defendant is in no position to raise the point by collateral attack. (*In re Shipp* (1965) 62 Cal.2d 547, 550-556 [43 Cal.Rptr. 3, 399 P.2d 571]; *In re Schlette, supra,* 232 Cal.App.2d 407, 413-417.)

 The alleged prejudicial error in bringing out defendant's status as a parolee was occasioned by his attempts to show the illegality of his arrest and detention, and later was brought out incidentally in connection with the statement attributed to defendant in connection with his bargaining with the officers.

---

[13]Possible failure to follow the California rule (*People* v. *Gonzales* (1944) 24 Cal.2d 870, 876-877 [151 P.2d 251] and the precepts of *Jackson* v. *Denno* (1964) 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908] in connection with the statement of July 13 are rendered immaterial in view of the absence of conflicting evidence upon which the court could rule. (See *In re Shipp* (1965) 62 Cal.2d 547, 551, fn. 1 [43 Cal. Rptr. 3, 399 P.2d 571].)

When the question first arose in connection with his seizure in Berkeley, the court heard the evidence of his parole status outside of the presence of the jury, and in permitting examination to go forward impliedly approved the legality of the arrest. In the examination reference was made to defendant's parole officer and an objection being made it was stricken and the jury was admonished to disregard it. A subsequent motion for mistrial was denied.

Thereafter, defendant on *voir dire* brought out the failure to bring defendant before a magistrate, after objection and warning by the People that they would attempt to explain the custody. Thereafter, without objection, testimony was adduced to show that defendant was under hold of the California Adult Authority and it wasn't necessary to arraign him right after his detention. The question of the propriety of this conclusion, noted above, is not before the court for lack of objection to the answer. The question arose again, however, when the People interrupted defendant's argument concerning the unlawful detention of defendant to assert that as a parole violator he did not have a right to prompt arraignment. This was made the basis of a motion for mistrial by the defendant which was denied, and was also urged on motion for new trial. The question goes both to the voluntariness of the confession, and the prejudice of showing other offenses. The status as a parolee with its implication of prior convictions was brought out through defendant's statements, and it cannot be said that on the whole record the additional statement regarding defendant's acknowledged status was prejudicial. (See *People* v. *Hernandez* (1962) 209 Cal.App.2d 33, 36 [25 Cal.Rptr. 640].) Insofar as the voluntariness of the confessions was concerned it has been shown that the delay in arraignment, although a factor in voluntariness is not per se fatal. In view of the short time involved and the failure to really make any other showing that statements were other than free and voluntary, no prejudice has been shown. ( See *People* v. *Rogers, supra.*)

The trial court did not abuse its discretion in refusing to permit the defendant to reopen his case to testify after he had rested. (*People* v. *Christensen* (1890) 85 Cal. 568, 570 [24 P. 888]; see *People* v. *Blye* (1965) 233 Cal.App.2d 143, 149 [43 Cal.Rptr. 231]; *People* v. *Aresen* (1949) 91 Cal.App.2d 26, 35-36 [204 P.2d 389]; *People* v. *Valencia* (1917) 32 Cal.App. 631, 632-633 [163 P. 865]; and compare *People* v. *Carter* (1957) 48 Cal.2d 737, 754-758 [312 P.2d 665].)

A reading of section 464 of the Penal Code shows that it is clear and unambiguous on its face. (See *People* v. *Tims* (1959) 171 Cal.App.2d 671, 676 [341 P.2d 56].) His objections to the concurrency of his present sentence with his former sentence, if sustained, could possibly lead to making them consecutive and need not further be discussed.

The judgment is affirmed.

Sullivan, P. J., and Molinari, J., concurred.

A petition for a rehearing was denied June 21, 1965, and appellant's petition for a hearing by the Supreme Court was denied June 30, 1965. Mosk, J., did not participate therein.