[Crim. No. 13413. In Bank. Dec. 17, 1969.]

THE PEOPLE, Plaintiff and Appellant, v.
KENNETH T. McGREW, Defendant and Respondent.

## COUNSEL

James Don Keller, District Attorney, and Richard H. Bein, Deputy District Attorney, for Plaintiff and Appellant.

George H. Chula for Defendant and Respondent.

## OPINION

**PETERS, J.**—The People appeal from an order of the San Diego Superior Court dismissing felony charges against defendant Kenneth T. McGrew.

McGrew was charged by indictment with transporting marijuana (Health & Saf. Code, § 11531) and with possession of marijuana for sale (Health & Saf. Code, § 11530.5). After pleading not guilty to both charges and waiving jury trial, McGrew moved the trial court to suppress all evidence of the charged offenses (under Pen. Code, § 1538.5) and to dismiss the indictment (under Pen. Code, § 1385). Both motions were granted. The People have appealed.

McGrew brought a new, securely locked footlocker to the United Airlines freight service at the San Diego airport in the afternoon of June 25, 1967, to be shipped to San Francisco. The freight agent, one Dowling,

observed that McGrew was wearing walking shorts and a T-shirt and had "quite long" hair. Dowling's supervisor had told him "to be on the alert for footlockers and suspicious people, and so on, that they had been shipping marijuana, . . ." to check out any suspected contraband, to "See what is in there, and if it is marijuana . . . call the police." Dowling was suspicious, because of McGrew's "general appearance," and because the locker, which McGrew declared contained books and clothes, had an "exceptional weight" of 112 pounds, although Dowling admitted that the weight was consistent with a shipment of two-thirds clothes and one-third books.

After McGrew paid for the shipment and left, Dowling called his supervisor, who told him to open up the footlocker to see what it contained. Using a nail and hammer to knock out the hinge pins, Dowling opened up the locker "a couple inches," just "enough to see what was in there." He observed several bricks or small packages, wrapped in brown paper or newspaper. He could not see the contents of the packages and he did not open any of them. He closed the lid of the footlocker and after calling his supervisor again, called the police.

San Diego Police Officer Burgess came, and Dowling "told him what had happened, and he said he would like to see [the locker]." Dowling "took him back and opened it up and showed him" the footlocker. The officer removed and inspected one of the packages. A federal narcotics agent then arrived, removed and examined the packages, and decided that the packages contained marijuana.[1] The officers inquired about fill, to weigh down the emptied footlocker, and Dowling furnished ballast. Using the ballast and one brick of marijuana, the officers repacked the locker for shipment to San Francisco.

Dowling notified other airlines about McGrew and the shipment. About 8 p.m. McGrew brought a blue footlocker, which he said contained books and dishes, to the Western Airlines freight service, where it was received by the freight clerk, one Case, who wrote up the airbill, and accepted the footlocker from McGrew. A fellow employee named Sweeney called United Airlines to tell them about the footlocker. The federal narcotics officer involved in the United Airlines transaction and two other officers went to the Western Airlines freight office. The footlocker was closed and locked. The federal narcotics agent "detected an odor of marijuana" by compressing the top of the footlocker and asked Sweeney and Case to open it, although they "were under no obligation to do so." Sweeney and Case opened the footlocker, on the suggestion of one of the officers, by knocking "the hinge pins out of the rear," using a hammer and nail. Sweeney opened up the lid, and the federal agent removed and opened the packages, which were

---

[1]The federal narcotics agent testified, Burgess did not. Dowling's testimony concerning the actions of Burgess is not challenged.

wrapped in brown paper. The footlocker was then repacked in the same manner as the one checked with United Airlines.

About 11 p.m., McGrew returned to the Western Airlines counter, purchased a ticket for San Francisco, and checked a suitcase. Case notified officers and told them that he had last seen McGrew walking through the terminal in the direction of the restaurant. The officers, Case and Dowling, went to the restaurant and found McGrew sitting at the end of the counter. Both Case and Dowling identified him, and the officers placed him under arrest. An officer found a Western Airlines baggage claim ticket in searching the person of McGrew. The officer returned to the Western Airlines luggage counter with the baggage claim ticket and secured the suitcase. He opened it and found marijuana.

The United Airlines employee, Dowling, testified that at the airlines training school he had been instructed that "we had the right to inspect shipments"; that an agent could open "anything that arouses your suspicions"; that the concern of the airlines was for "aircraft safety," for improperly declared goods going at a cheaper rate, and for overvalued goods, such as a TV set claimed to be good but in fact with "the picture tube . . . kicked in." He could not recall being instructed to check to see whether contraband was being shipped.

He testified in connection with the McGrew search that he was not concerned about aircraft safety or rate structures; that when he opened up the locker he was looking for one thing, to determine whether marijuana was contained in the locker. He did not, however, smell marijuana before opening the locker.

He further testified that in searching the footlocker he was following his orders to assist the police; that he suggested and furnished ballast to the police in response to their inquiry about fill, to weigh down the emptied footlocker and that in so doing he was following his orders to assist the police; that before the McGrew incident, he had opened two other footlockers, in the presence of the police, having obtained the combination to the locks from the police; that he found contraband in the two lockers, and that he knew of two other footlockers having been opened by fellow employees, in which contraband was not found.

The People stipulated that the officers did not have a search warrant for either search.

The trial court found that the United Airlines employee, in opening the footlocker, acted solely for police purposes and in response to police suggestion, and in reopening the footlocker in the presence of the police, acted solely for police purposes; that the information obtained from

the United Airlines search led to the search of the footlocker at Western Airlines; that the Western Airlines employee who opened the footlocker acted solely for police purposes and at the request of the police; that the police had no warrant; that there was sufficient time to obtain a warrant; and that the arrest of the defendant directly resulted from the searches of the United and Western footlockers. The court concluded that both searches were unlawful, the arrest was unlawful, and all evidence should be suppressed.

We find it unnecessary to determine whether Dowling, the United Airlines employee, must be considered an agent of the police in opening the footlockers because, even assuming that he was not, the subsequent searches by law enforcement officers or at their express and specific direction (cf. *Stapleton* v. *Superior Court,* 70 Cal.2d 97, 100 [73 Cal. Rptr. 575, 447 P.2d 967]), were unlawful and the evidence must be suppressed.

*People* v. *Marshall,* 69 Cal.2d 51, 57 [69 Cal.2d 51, 57 [69 Cal.Rptr. 585, 442 P.2d 665], makes clear that with certain exceptions, probable cause to believe that "a search will reveal contraband . . . does not justify a search without a warrant." Where there is probable cause, a warrant still must be obtained, absent an emergency, for a search not incident to a valid arrest even though a warrant would not be needed for a search incident to an arrest. (E.g., *People* v. *Harris,* 62 Cal.2d 681, 682-683 [43 Cal.Rptr. 833, 401 P.2d 225].)

The exceptions to the requirement of a search warrant, aside from searches incident to an arrest, are where there is a danger of " 'imminent destruction, removal, or concealment of the property intended to be seized' " or where the evidence is in plain sight, which "is, in fact, no search for evidence." (*People* v. *Marshall, supra,* 69 Cal.2d 51, 56-57, 61.)

Our decision in *Marshall* is not limited to dwelling houses. The Fourth Amendment protection of "effects" includes securely closed footlockers shipped through common carriers. Neither the language of the Fourth Amendment, nor of any of the cases interpreting the protection of that amendment, suggest that warrants apply to "houses" but not to "effects." The exceptions to the requirement of a warrant are based on circumstances and not on categories of items. The requirement of a warrant, unless otherwise excused, applies to whatever is protected by the Fourth

Amendment. (See *Katz* v. *United States* (1967) 389 U.S. 347, 356-357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507].[2]

None of the exceptions apply to the United or Western Airlines searches of the footlockers. When the footlocker checked with United Airlines was searched by the police, McGrew "was neither present nor arrested until several hours after the search." (*People* v. *Marshall, supra,* 69 Cal.2d 51, 61.) His whereabouts were similarly unknown when the footlocker checked with Western Airlines was searched. Nor was there any likelihood that the lockers would be removed or the contraband destroyed; both footlockers were safely in the custody of the airlines. Both footlockers had been shipped on a "space available" basis, so that the airlines were not even under a contractual obligation to ship the footlockers before a warrant could be obtained.

The evidence was not in plain sight, since both lockers were closed when the police arrived, and the marijuana was wrapped in packages. "It is inherently impossible for the contents of a closed opaque container to be in plain view regardless of the size of the container or the material it is made of. A search of the container is necessary to disclose its contents. A search demands a search warrant." (*People* v. *Marshall, supra,* 69 Cal.2d at p. 59; see also *People* v. *Hawkins,* 273 Cal.App.2d 529, 533-534 [78 Cal. Rptr. 286].) The People's reliance on *People* v. *Roberts,* 47 Cal.2d 374 [303 P.2d 721]; *People* v. *Ouellette,* 271 Cal.App.2d 33 [76 Cal.Rptr. 346], and *People* v. *Anderson,* 266 Cal.App.2d 125 [71 Cal.Rptr. 827], is misplaced. In those cases, the object was in plain sight; in *Roberts* a radio believed stolen, in *Ouellette* a corncob pipe and dark debris which was in a waxed paper bag, and in *Anderson* part of a marijuana cigarette.

The People contend that by shipping the footlocker with a common carrier under a "contract," the receipt for the goods shipped which refers to but does not contain an inspection clause,[3] McGrew waived any Fourth

---

[2]*People* v. *Teale,* 70 Cal.2d 497 [75 Cal.Rptr. 172, 450 P.2d 564], is not to the contrary. *Teale* merely authorizes the *search* of an "automobile or other object," without a warrant, based on "reasonable belief that such object is itself evidence," but only when the *seizure preceding the search is incident to a lawful arrest.* (70 Cal.2d at p. 510; italics omitted.)

[3]The inspection clause on which the People rely is contained in C.A.B. regulations and states only: "INSPECTION OF SHIPMENTS All shipments are subject to inspection by the carrier, but the carrier shall not be obligated to perform such inspection." (Rules and Regulations, Issued November 8, 1967, C.A.B. No. 96, rule No. 24.) The basis for imputing knowledge of this rule is the rapid airbill (a receipt) which states in part on the back (in gray type): "2. It is mutually agreed that the shipment described herein is accepted . . . subject to governing classifications and tariffs . . . ."

Amendment protection that would otherwise attach to a closed and secure footlocker, and impliedly consented to the search by the airlines employee and by the police.

The People argue in effect that any waiver of Fourth Amendment protection, for whatever limited purposes, results in a waiver for all purposes. This contention was rejected in *Corngold* v. *United States*, 367 F.2d 1, 7, also involving a search of baggage shipped through an airlines freight service.

*Corngold* relied on *Stoner* v. *California* (1964) 376 U.S. 483, 489 [11 L.Ed.2d 856, 861, 84 S.Ct. 889], which rejected the contention that implied consent of access for any purpose results in consent for all purposes: "It is true . . . that when a person engages a hotel room he undoubtedly gives 'implied or express permission' to 'such persons as maids, janitors or repairmen' to enter his room 'in the performance of their duties.' [Citation.] But the conduct of the night clerk and the police in the present case was of an entirely different order."

In *Corngold* v. *United States, supra,* 367 F.2d 1, the court ruled that "Appellant did not abandon his package; and mere surrender of custody to a carrier did not forfeit appellant's right to privacy. [Citations.] . . . Appellant's package, securely wrapped and tied, was delivered to the airline solely for transportation from Los Angeles to New York, and the inspection clause in TWA's tariff authorized examination only by the carrier itself." (367 F.2d at pp. 7-8.)

*Stoner* and *Corngold* recognize that the scope of consent to an invasion of privacy depends upon the circumstances. Other cases involving implied limited consent to an invasion of privacy make clear the significance of the circumstances. Thus, in *United States* v. *Blok* (1951) 188 F.2d 1019, 1021 [88 App. D.C. 326], the police searched the desk of an employee; the court, in holding the search unlawful, stated: "No doubt a search of [the desk] without her consent would have been reasonable if made by some people in some circumstances. Her official superiors might reasonably have searched the desk for official property needed for official use." (See also, *Cunningham* v. *Heinze* (9th Cir. 1965) 352 F.2d 1, 5, cert. denied, 383 U.S. 968 [16 L.Ed.2d 309, 86 S.Ct. 1274], following *Stoner*. Compare searches properly within the implied consent to search in *People* v. *Plane,* 274 Cal.App.2d 1, 4 [78 Cal.Rptr. 528] [landlord entered tenant's apartment to shut off lights and oven]; *In re Donaldson,* 269 Cal.App.2d 509, 510 [75 Cal.Rptr. 220] [search of student's locker

by school vice principal]; *People* v. *Rightnour*, 243 Cal.App.2d 663, 666 [52 Cal.Rptr. 654] [maid entered guest's room to clean up]; *People* v. *Gonzales*, 182 Cal.App.2d 276, 277-278 [5 Cal.Rptr. 920] [search of knife-wounded victim by hospital personnel to determine identity].)

That privacy is not an absolute concept, but depends upon the circumstances, was made clear by *People* v. *Edwards*, 71 Cal.2d 1096, 1104 [80 Cal.Rptr. 633, 458 P.2d 713], where contraband in a trash receptacle was held protected against searches by the police, although, by placing the contraband in a trash receptacle, the defendants would have waived any claim to privacy as to the trash collector. The issue it was pointed out was the reasonable expectancy that property will be preserved from the intrusive scrutiny of others.

The same standard of reasonable expectancy used to determine zones of privacy determines the extent of implied consent to invade an individual's privacy. The hotel guest may reasonably expect a maid to enter his room to clean up, but absent unusual circumstances he should not be held to expect that a hotel clerk will lead the police on a search of his room. Similarly, in the instant case, McGrew might have expected that an airlines employee would inspect where a danger or inconsistency was observed, but he could not reasonably be expected to anticipate police searches for contraband. He may not be held to have consented to searches by police officers totally unrelated to the interests of the airlines in the hope that contraband may be discovered. (Cf. *Parrish* v. *Civil Service Com.*, 66 Cal.2d 260, 274 [57 Cal.Rptr. 623, 425 P.2d 223].)

It is also urged that the police search was nonetheless lawful, because the police reasonably and in good faith believed that the airlines employee could authorize a search of McGrew's luggage. The contention is without merit.

■   The rule governing searches based on consent by a third party was stated in *People* v. *Hill*, 69 Cal.2d 550, 554 [72 Cal.Rptr. 641, 446 P.2d 521], certiorari granted 396 U.S. 818 [24 L.Ed.2d 68, 90 S.Ct. 112]: "[A] search is not unreasonable if made with the consent of a third party whom the police reasonably and in good faith believe has authority to consent to their search . . . ." The operative word in the rule is "reasonably;" thus, there must be some objective evidence of joint control or access to the places or items to be searched which would indicate that the person authorizing the search has the authority to do so. (E.g. *People* v. *Hill*, *supra*, 69 Cal.2d 550, 554-555, and cases collected [visitor consenting to search of apartment]; *People* v. *Gorg*, 45 Cal.2d 776, 783 [291 P.2d 469]

[owner; search of boarder's room]; *People* v. *Linke,* 265 Cal.App.2d 297, 315 [71 Cal.Rptr. 371] [cotenant]; *People* v. *Garner,* 234 Cal.App.2d 212, 230 [44 Cal.Rptr. 217] [wife; husband's property].)

The good faith mistake rule does not, however, apply where the third party makes clear that the property belongs to another. (E.g., *People* v. *Cruz,* 61 Cal.2d 861, 866 [40 Cal.Rptr. 841, 395 P.2d 889] [guest in apartment could not consent to search of boxes and luggage belonging to others]; *People* v. *Egan,* 250 Cal.App.2d 433, 436 [58 Cal.Rptr. 627] [parents could not consent to search of bag where made clear that bag not parents']; *Holzhey* v. *United States* (5th Cir. 1955) 223 F.2d 823, 824 [relatives could not consent to search of locked cabinet]; compare, *Sartain* v. *United States* (9th Cir. 1962) 303 F.2d 859, 862-863, cert. denied, 371 U.S. 894 [9 L.Ed.2d 127, 83 S.Ct. 194] [friend could consent to search of suitcase where defendant left suitcase with key attached].)

Moreover, the good faith rule does not apply where the relationship of the third party and the defendant makes clear that the defendant has not authorized the third party to act as his agent. Thus, in *Stoner* v. *California, supra,* 376 U.S. 483, 488 [11 L.Ed.2d 856, 860, 84 S.Ct. 889], the Supreme Court, in holding that a room clerk could not consent to the search of a guest's room, and rejecting the "claim that the search was reasonable because the police, relying upon the night clerk's expressions of consent, had a reasonable basis for the belief that the clerk had authority to consent to the search," stated: "[T]here is nothing in the record to indicate that the police had any basis whatsoever to believe that the night clerk had been authorized by the petitioner to permit the police to search the petitioner's room" (*id.,* at p. 489 [11 L.Ed.2d at p. 860]).

The language and the rule of *Stoner* apply equally to the instant case: The police knew that someone had attempted to ship a footlocker which the airlines employee believed contained marijuana. They had no reason to believe that the shipper had authorized the employee to turn the trunk over to the police. Nor could the police rely on the right of the airlines to inspect goods shipped. As pointed out above, the consent to inspection by the airlines was limited to consent for inspection for the airlines' own purposes.

We conclude that the trial court properly suppressed the evidence obtained by the police searches of the footlockers.

It is also urged that, apart from the evidence furnished by the police searches, the officers had probable cause to arrest McGrew when he was found in the restaurant and that the search of his suitcase obtained from a Western Airlines clerk was a valid search incident to that arrest. However, apart from the matters learned from the police searches, the only

information the police had at the time of the arrest was that McGrew had checked a footlocker at both United and Western Airlines, that the one checked at United, when opened by the airline employee, was observed to contain several bricks or small packages wrapped in brown paper or newspaper, and that McGrew had checked a suitcase and purchased a ticket for San Francisco. The weight of the footlocker left with United was consistent with a shipment of two-thirds clothes and one-third books, the items McGrew had declared to be in the footlocker, and there is nothing to indicate that the packages observed by the United employee were not entirely consistent with wrapped books. The fact that McGrew had checked pieces of luggage at three different times with two airlines is not incriminating, and we are satisfied that the information obtained by the officers apart from their unlawful search did not furnish probable cause to arrest McGrew for possession of marijuana and that arrest was unlawful. The search of the suitcase may not be sustained as incident to a valid arrest, and the evidence secured by that search was properly suppressed. This conclusion makes it unnecessary to consider whether the search of the suitcase occurred at the place of the arrest and was contemporaneous therewith. (Cf. *People* v. *Cruz, supra,* 61 Cal.2d 861, 865.)

Since the evidence secured by the police searches must be suppressed, there is not sufficient evidence to hold defendant for trial.

The order appealed from is affirmed.

Traynor, C. J., Tobriner, J., and Sullivan, J., concurred.

**MOSK, J.**—I dissent.

Section 11531 of the Health and Safety Code makes it a felony for any person to transport marijuana. The section applies not only to one who arranges shipment, as the defendant here, but it would also apply to any airline employee who knowingly transports marijuana. Thus if an airline employee reasonably believes a shipment contains a substance the transportation of which is illegal, he has the right and perhaps a duty to inspect the package or container. The purpose of such inspection is not to act as an agent of the police, but to insulate himself from any criminal culpability.

When the defendant arranged for the shipment of his footlocker he signed a "rapid airbill" which stated as one of the "conditions of contract" that it was accepted subject to governing classifications in effect on that date and filed in accordance with law. One of the Civil Aeronautics Board rules

provides that "The carrier has the right, but not the obligation, to inspect shipments."[1]

In *People* v. *Edwards* (1969) 71 Cal.2d 1096 [80 Cal.Rptr. 633, 458 P.2d 713], this court indicated that in determining admissibility of evidence the significant criterion is the defendant's "reasonable expectation of privacy" in maintaining actual or constructive possession of the objects at issue. While undoubtedly this defendant hoped to avoid detection in shipping contraband, I find it difficult to conclude that he had a *reasonable* expectation of privacy when he shipped a footlocker by an interstate carrier which had a right of inspection given to it by the administrative agency regulating the airline and its operations. This defendant declared to one carrier he was shipping "clothing and books" and to the other he represented he was shipping "books and dishes." The rates charged for shipment were based on those representations, which were knowingly false. If, for any reason, an airline employee doubted the shipments contained the objects indicated, he had an unquestioned right to open the containers for inspection. This right of the airline is not diluted by the fact that contraband was discovered—which could not be shipped at any rate—rather than some legal perishable commodity, which could be shipped at a rate different from that prescribed for clothing, books and dishes.

To deny the airline through its employees a right of inspection when they doubt, for any reason, that a package contains the objects represented by the shipper to be therein, results in compelling the airline, an innocent third party, to blind itself to reality and thus to assist the defendant in his illicit commercial enterprise of transporting marijuana. This is the unfortunate result of the majority opinion.

The majority lean heavily on *Corngold* v. *United States* (9th Cir. 1966) 367 F.2d 1. In *Corngold* the transportation agent was initially contacted by government agents who directed him to a specific package and asked him to open it. Our case is factually closer akin to a more recent Ninth Circuit decision which carefully circumscribed the *Corngold* rule: *Gold* v. *United*

---

[1]This is not demonstrably certain from the evidence offered on this subject by the prosecuting attorney. A copy of C.A.B. regulation No. 96 (Exh. 10) and a copy of United Airlines Tariff rules (Exh. 11) were received in evidence. The former became effective on August 1, 1967, and the latter on December 8, 1967. The offense charged in this case took place prior to both dates: June 25, 1967. However, Dowling testified Exhibit 10 was similar to pages used by him in his daily work, and the prosecutor represented to the court "that is the actual regulation that was in effect at the time we are interested in." Defense counsel objected on numerous grounds to the admission of Exhibit 10, but he did not challenge the prosecutor's representation. The court must have accepted the prosecutor's statement as being factual for the exhibit was received in evidence; had it related only to dates subsequent to June 25, 1967, it would have been irrelevant.

*States* (9th Cir. 1967) 378 F.2d 588, in which at pages 590-591, the court held *Corngold* inapplicable to a situation in which the transportation personnel, with "suspicions aroused . . . had no way to determine whether the contents were fit for carriage and properly classified except by opening them. This the carrier had the right to do under its tariffs." Indeed, the instant case is stronger than *Gold,* for here there was no prior direct contact between law enforcement officers and the airline employee. Dowling opened the footlocker at the direction of his company supervisor, not upon police suggestion.

It was not a law enforcement agency but Dowling who notified other airlines about the defendant and his shipment. Pursuant to that warning Western Airlines employees Case and Sweeney observed the defendant's footlocker and called United to report. Fortuitously the police had then arrived at United and they proceeded from there to the Western offices. They noted the footlocker pointed out to them by the Western employees and could readily detect from it "an odor of marijuana." This justified the subsequent search and seizure. (See my dissent in *People* v. *Marshall* (1968) 69 Cal.2d 51, 62 [69 Cal.Rptr. 585, 442 P.2d 665].)

As this court recently held in *People* v. *Superior Court* (1969) 70 Cal.2d 123, 128 [74 Cal.Rptr. 294, 449 P.2d 230]: "The conduct of a person not acting under the authority of a state is not proscribed by the Fourth or Fourteenth Amendments of the federal Constitution. There are no state standards for 'search and seizure' by a private citizen who is not acting as an agent of the state or other governmental unit. Therefore, acquisition of property by a private citizen from another person cannot be deemed reasonable or unreasonable (*People* v. *Randazzo* (1963) 220 Cal.App.2d 768, 775-776 [34 Cal.Rptr. 65] [citation] cert. den. 377 U.S. 1000 [12 L.Ed.2d 1050, 84 S.Ct. 1933] [citations], and a motion to suppress evidence so obtained cannot be made on the ground that its acquisition constitutes an unreasonable search and seizure under section 1538.5."

Since the airline employees had a legal right to inspect the footlockers, I can see no impediment to their advising the police of the presence of contraband and to the police taking possession of and making evidentiary use of the contraband displayed to them. Indeed, that was the precise situation in *People* v. *Superior Court* (1969) *supra,* 70 Cal.2d 123, in which a private detective gave a copy of a tape recording to law enforcement officers. We properly declined to suppress the evidence prior to trial. To the same effect is *Wolf Low* v. *United States* (9th Cir. 1968) 391 F.2d

61, 63, in which the court found proper the "conduct of the airline in turning over to the Government the fruits of its search of the defendant's suitcases, and the conduct of the Government in making use of the information and evidence obtained by the airline's search. . . ."

As the majority concede, *People* v. *Hill* (1968) 69 Cal.2d 550, 554 [72 Cal.Rptr. 641, 446 P.2d 521], holds that a "search is not unreasonable if made with the consent of a third party whom the police reasonably and in good faith believe has authority to consent to their search . . . ." The police belief was entirely reasonable and in good faith here, since it was founded upon the right legally conferred upon the airlines to inspect shipments in their possession, the inspections actually made pursuant to that right, the discovery of contraband legally ineligible for shipment, the reporting of these events to the police and the disclosure to the police of the actual contraband.

I would hold the searches were valid, the suppression of evidence erroneous, and the defendant should be required to stand trial in order to ascertain his innocence or guilt.

McComb, J., and Burke, J., concurred.