[Crim. No. 3686. Fourth Dist., Div. Two. Feb. 20, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
MELVIN ALLEN CHILDS, Defendant and Appellant.

## Counsel

Charles E. Ward, Public Defender, and Donald M. Magdziasz, Deputy Public Defender, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**GARDNER, J.**—Defendant was charged with violation of Health and Safety Code, section 11530 (possession of marijuana) and with violation of Health and Safety Code, section 11910 (possession of restricted dangerous drugs).

He pleaded not guilty. A motion under Penal Code, section 1538.5, was submitted to the court upon defendant's memorandum of points and authorities and on the preliminary hearing transcript. The motion was denied.

Defendant withdrew his plea of "not guilty" and pleaded "guilty" as charged. Pronouncement of judgment was withheld and probation was granted for a period of two years on certain terms and conditions.

Defendant appeals from the order granting probation and from the denial of his motion under Penal Code, section 1538.5.

James R. Cox, a deputy sheriff for the County of San Bernardino, was in uniform and driving a marked sheriff's patrol unit on routine patrol in a high crime rate commercial area on April 27, 1968. Officer Cox had been a regular deputy sheriff for ten months and a reserve officer for two years.

At approximately 3:40 a.m., Officer Cox observed a 1964 Pontiac which attracted his attention due to the rate of speed at which it proceeded through an intersection. The posted speed limit in the area was 25 miles per hour and the Pontiac was exceeding 35 miles per hour.

The car, after passing through the intersection, made a U-turn, approximately 35 to 40 yards from the intersection. When it made the U-turn, it "turned the dirt up pretty good. It made a dust cloud." The car returned to the intersection, then turned to the left. Officer Cox followed the car to stop it because of the speed that it had traveled through the intersection and the late hour. The car came to another intersection and the blinker lights came on indicating a left turn. However, instead of turning left, it slowed down almost to a dead stop, then continued to go forward. At this point, Officer Cox turned on the red lights of his sheriff's unit and the vehicle turned left at another intersection, then into a closed service station where it came to a halt at approximately 3:45 a.m.

Officer Cox called in the license number of the vehicle, got out of his unit and approached the car. He testified that he did not have in mind at that time to cite the driver, or, to use his words, "to actually make a written citation." Defendant, the driver of the vehicle, stepped out and greeted him just as Officer Cox approached the driver's door. Defendant's car bore an out of state license. Officer Cox observed, in addition to the defendant, there was one male occupant in the right front seat and one male occupant was in the rear center seat.

Officer Cox asked defendant for his California driver's license. Defendant produced his operator's license from the State of Nevada, stating that he had just come into the state recently. Officer Cox explained to defendant why he had made the stop: because of the way the vehicle had been going, the late hour, the commercial area, not knowing the vehicle in that particular area and the out-of-state license plate.

The driver's door was open and as he was standing there, Officer Cox observed a dark colored, small bottle resembling those in which pills are found for medication. The bottle was located on the floor area next to the drivers' seat. It was readily visible. The officer could see pills in the bottle, but he could not identify what type of pills they were. The bottle was labeled in part "Tranquilizers." Officer Cox picked up the bottle and while asking the defendant what was in the bottle, he simultaneously opened it. It had a plastic lid which he simply popped off. The bottle contained three yellow-scored tablets, which in the opinion of Officer Cox were possibly illegal and illicit drugs. The officer had had instructions in vice and narcotics, had attended five training stations in marijuana and dangerous drugs, had attended training demonstrations concerning narcotics, had read several textbooks on the subject, had handled approximately 15 drug cases, and had investigated approximately 50 marijuana cases prior to this incident.

He then asked the other two occupants to exit from the vehicle and asked the defendant, "May I search your car?" or "Can I search your car?" The defendant replied to the effect, "Yes, go ahead" and stepped back.

Officer Cox found several items in his subsequent search of the vehicle. The first was a small double-scored white tablet found beneath the passenger seat on the floor area in plain sight. In the officer's opinion, this pill was some kind of a barbiturate or amphetamine. He checked the glove compartment and found an Excedrin bottle which contained among the Excedrin tablets one blue and orange capsule which looked to the officer to be some type of a barbiturate, also a reddish tablet, also fragments of a reddish-white tablet. In the glove compartment was a bottle which had "Tedrol" written on it. This bottle contained 22 single-scored tablets which in the officer's opinion were some type of illegal drugs. Officer Cox continued his search and found seven or eight marijuana seeds on the rear floor area and also in the front area of the vehicle. Then beneath the floor mat on the driver's side, Officer Cox found a wax paper bag containing a brownish, greenish leafy substance with small seeds in it which in the officers' opinion was marijuana.

Defendant testified on his own behalf for the limited purpose of the consent issue only. He testified that when stopped by Officer Cox, he was asked, "Can I search your car?" to which he answered, "Go right ahead." He testified that he said, "Yes, go right ahead" because the wanted to cooperate with

the officer, he did not want to give him a bad time and he figured that the officer would go ahead and do it anyway. The defendant testified that the officer's request to search was made in a pleasant tone of voice and not in the form of a command. The defendant stated that he was never in fear of the officer and that he did nothing which would lead the officer to believe that he did not want him to search the car.

Defendant makes two allegations of error:

## I.

THAT THE DEPUTY SHERIFF LACKED LEGAL JUSTIFICATION TO STOP AND DETAIN THE DEFENDANT'S CAR.

The defendant was observed by the arresting officer driving at a speed in excess of the posted limit. This would justify him in stopping the defendant's car.

The defendant argues that since the officer did not have it in his mind to write a traffic citation, there was no lawful reason to detain him. ▮ This argument is frivolous in that an officer may always warn or reprimand a driver about the operation of his vehicle without necessarily citing him. The fact that the officer did not have it in mind to cite the defendant may not be separated, as a sole fact, from all the other circumstances surrounding the detention.

## II.

THAT THE SEARCH OF THE DEFENDANT'S VEHICLE WAS ILLEGAL BECAUSE IT WAS NOT JUSTIFIED BY THE CONSENT GIVEN.

The trial court made an implied finding that the consent to the search was voluntary. This finding can be made on the basis of Officer Cox's testimony. ▮ Under long established rules, that finding is binding on this court. "A reviewing court cannot reject the testimony of a witness that has been believed by the trier of fact unless there exists either a physical impossibility that it is true or its falsity is apparent without resorting to inferences or deductions." (*People* v. *Hrisoulas,* 251 Cal.App.2d 791, 796 [60 Cal. Rptr. 80].)

However, defendant does not seriously contend that this court should overrule the finding of the trial court as to the consent which was ultimately given, but contends rather that that consent was the product of illegal police conduct and thus inextricably bound up with illegal conduct, i.e., the seizure and opening of the bottle containing the pills.

With the use of illegal (and legal) dangerous drugs assuming awesome proportions, it would appear eminently reasonable for a law enforcement

officer, charged with protecting the security and safety of law abiding citizens, who has stopped a car which has been operating in an erratic manner, who sees in plain sight on the floor next to the driver's seat a bottle bearing the caption "Tranquilizers" and clearly containing pills, to open the bottle and identify the pills.

The combination of the circumstances in this case made it the duty and responsibility of the officer to see whether or not the presence of suspected dangerous drugs, legal or illegal, might explain the peculiar behavior of the driver of the vehicle. The protection of the motoring public demands that much of the police officer.

If the bottle had contained aspirin, the momentary inconvenience to the defendant would have been but a small price to pay for the protection afforded other motorists by an alert officer. If it bore a prescription label indicating that it contained legally obtained dangerous drugs, the officer, in view of the erratic driving, would have had the right and the duty to observe the driver closely and even to give him a roadside sobriety test if he considered it necessary before allowing him to proceed.

Perhaps 10 or 20 years ago it would have been unreasonable for the officer to open the bottle. Today with the common knowledge that the use of legally and illegally obtained dangerous drugs is so widespread and the common knowledge that the use of these drugs may have an appreciable effect upon the operation of a motor vehicle, it would clearly appear that the action of the officer in ascertaining the type of drugs by simply opening the bottle was a reasonable action on his part.

Obviously, defendant is attempting to bring this case under the umbrella of *People* v. *Marshall,* 69 Cal.2d 51 [69 Cal.Rptr. 585, 442 P.2d 665], which holds that the contraband must be in "plain sight" to justify its seizure without a warrant. But here the officer, without prying or searching or opening anything, could see pills which were in "plain sight" in a dark bottle.

Two cases which we feel are persuasive in the interpretation of that which is in "plain sight" are *People* v. *Ouellette,* 271 Cal.App.2d 33 [76 Cal.Rptr. 346], and *People* v. *Anderson,* 266 Cal.App.2d 125 [71 Cal. Rptr. 827].

In *Ouellette,* when officers saw "what appeared to be a wax paper bag with some sort of debris or something inside," the court held: "Observing that which was in plain sight was not a search." (*People* v. *Ouellette, supra,* p. 37.)

In *Anderson,* the officer in looking through the window of defendant's car saw a cigarette similarly constructed to cigarettes he had seen in connection with the arrests he had made in connection with marijuana. Thereupon he opened the door to examine the cigarette "more closely." The court said at page 132: "In the instant case, after Hill [the officer] saw the first cigarette, which from his experience he suspected to be marijuana, he had probable cause to open the door and make an investigation, which discovered the other cigarettes. [Citations.]

"We do not consider that the decision of *People* v. *Marshall,* 69 Cal.2d 51 . . . , is to the contrary. Factually, the cases are significantly different. The contraband in *Marshall* was in a closed paper bag in an open box; the bag gave no visible exterior evidence as to its contents; it was in a building in which a number of policemen were lawfully present, of whom several might have safeguarded the suspected contraband while another went for a search warrant.

"The distinction between the measures reasonably required by the discovery of suspected contraband in a vehicle capable of mobility and the presence of such contraband in a house is well recognized. (*People* v. *Terry,* 61 Cal.2d 137, 152-153 . . .)

"Nor do we think the *Marshall* holding compels the view that the lawful observation of a suspected marijuana cigarette in a vehicle may not be followed by a seizure thereof or an investigation of its contents, even though the contents are not visible through the paper wrapper, if all the usual exterior indicia of a marijuana cigarette are present, as well as other circumstances to bolster the inference that the cigarette contains marijuana."

In *People* v. *McGrew,* 1 Cal.3d 404, 410 [82 Cal.Rptr. 473, 462 P.2d 1], the Supreme Court in commenting on the *Ouellette* and *Anderson* cases said: "In those cases, the object was in plain sight; . . . , in *Ouellette* a corncob pipe and dark debris which was in a wax paper bag, and in *Anderson* part of a marijuana cigarette."

■ Thus, the combination of circumstances of a vehicle being driven on an erratic course at an early hour of the morning, plus a bottle at the foot of the driver bearing the caption "Tranquilizer" which bottle clearly contained pills which were visible as pills, would indicate to a reasonable man in a like position that opening the bottle to further identify the pills was necessary to the discharge of the officer's duties. Asking the officer to obtain a search warrant so as to obtain a magistrate's "neutral and detached" determination is unreasonable. It was also unnecessary. The pills were in "plain sight."

Under the facts and circumstances of this case, we hold that the opening

of the bottle was a reasonable act on the part of the officer. To hold otherwise, would be to "magnify technicality at the expense of reason." (*People* v. *Kampmann,* 258 Cal.App.2d 529, 533 [65 Cal.Rptr. 798].)

Judgment affirmed.

Kerrigan, Acting P. J., and Tamura, J., concurred.