Joseph McGALLIARD, Appellant,

v.

STATE of Alaska, Appellee.

No. 1085.

Supreme Court of Alaska.

June 5, 1970.

Raymond A. Nesbett, Nesbett & Johnstone, Donald A. Burr, Burr, Pease & Kurtz, Anchorage, for appellant.

Douglas B. Baily, Dist. Atty., Richard R. Felton, Asst. Dist. Atty., Anchorage, G. Kent Edwards, Atty. Gen., Juneau, for appellee.

Before DIMOND, RABINOWITZ, and CONNOR, JJ., and FITZGERALD and BUTCHER, Superior Court Judges.

RABINOWITZ, Justice.

Appellant was indicted on three separate counts of receiving and concealing stolen property. After trial by jury, appellant was found innocent of two counts and guilty as to one count of knowingly receiving and concealing brass fittings, screws, and valves which had allegedly been stolen from Urban Plumbing and Heating.[1] Before this court the sole specification of error asserted is that the trial court committed error in

---

1. Count I of the indictment itemized approximately 172 brass fittings, screws, and valves which were alleged to have been stolen from Urban Plumbing and Heating, and subsequently received and concealed by appellant.

As to the counts upon which McGalliard was acquitted, Count II alleged that he received and concealed "approximately 2180 pounds of copper wire, which had been stolen from Ralph Bailey, knowing it to have been stolen." Count III charged that appellant received and concealed "a 30 inch" diameter brass propeller which had been stolen from Elias Tout, knowing it to have been stolen."

failing to grant appellant's motion to suppress on the ground that the evidence in question was obtained as a result of an antecedent unlawful search and seizure.

Appellant Joseph McGalliard was a dealer in scrap metals. Sometime prior to March 4, 1968, he loaded a Sea-Land van which was spotted on the latter's premises, with scrap for shipment to a buyer in Seattle. On March 4, the van was sealed and a bill of lading issued to appellant.

For some two or three months prior to March 4, the Anchorage Police Department had suspected appellant was involved in shipping goods which had been stolen from various local businesses. During this period, the police had on one occasion searched a shipment of scrap made by appellant while the van was still on Sea-Land's premises. At various times the police had also watched appellant's scrap yard and loading sites. As part of this surveillance, they persuaded Ernest Webb, Sea-Land's terminal manager, to call them whenever appellant loaded a van for shipment.

On the morning of March 5, 1968, Webb telephoned Investigator Fred Taylor of the Anchorage Police Department and told him that appellant was "loading a van of scrap" in Sea-Land's yard. Webb, Investigator Taylor, and Police Sergeant Anderson, then proceeded to the location of the Sea-Land van in question. Webb broke the seal. The three entered and once inside walked on top of the scrap. At the time the seal was broken and entry made, the police had not as yet obtained a search warrant. While in the van, Investigator Taylor noticed a brass propeller which furnished the sole basis for the search warrant the police obtained later that day. In an affidavit filed in support of his application for a search warrant, Investigator Taylor described a propeller he had observed in the Sea-Land van, and averred it fit the description of a propeller which had been stolen from the Anchorage Marina.[2] On the basis of these statements, a search warrant was issued authorizing a search of Sea-Land's van No. 44088 for

certain property described as one (1) 30 inch diameter four (4) blade, brass propeller, damaged and corroded, sleeved with a 2–2½ taper, and keyed for a shaft; one (1) brass nut with 1½ inch thread, and Coolidge three (3) blade brass propeller, 18 inches in diameter stolen or embezzled from Anchorage Marina, Terminal yards, Anchorage, Alaska, on or about Feb. 2, 1968.

In a search of the van conducted under the authority of this search warrant, the police opened one or more barrels and discovered miscellaneous brass fittings, screws, and valves. These items furnished a substantial portion of the evidence pertaining to the Urban Plumbing and Heating count of the indictment upon which appellant was convicted. At trial, appellant moved to suppress the fittings, screws, and other items described in the inventory made of the items

2. In his affidavit, Investigator Taylor stated in part:

That he investigated a burglary which occurred on February 2, 1968 at Anchorage Marina, Terminal Yards * * * and determined that approximately 10 brass propellers, including an 18 inch four-bladed brass propeller, damaged and corroded, keyed for a shaft and sleeved with a 2 to 2½ inch taper; two brass stuffing boxes; fifteen dollars ($15.00) in coin; and one (1) brass nut with a 1½ inch thread were missing;

That on March 5, 1968, while in the company of Ernie Webb, an employee of Sea Land, Inc. and authorized to inspect vans consigned for shipment, he observed a 30 inch four-bladed brass propeller, damaged and corroded, keyed for a shaft and sleeved with a 2 to 2½ inch taper in Sea Land Van 44–088 located at 1717 Tidewater Street, Anchorage, Alaska, and consigned to Sea Land, Inc. for shipment to Federated Metals, Seattle, Washington;

That said propeller fits the description of one stolen from said Anchorage Marina, Terminal Yard, Anchorage, Alaska;

That therefore I believe that additional items stolen from said Anchorage Marina may be located in said van.

which were seized from the interior of the Sea-Land van.[3] In denying the suppression motion, the trial court noted that the motion should have been made prior to trial but exercised its discretion to decide the matter on its merits.

Appellant argues that the evidence in question was seized under a warrant which constituted the "fruits of the poisonous tree" of the warrantless search conducted by Investigator Taylor and Officer Anderson of the Sea-Land van. In appellant's view, this initial entry of the van by Taylor and Anderson constituted a search which was not conducted incident to an arrest, pursuant to a search warrant, or otherwise constitutionally permissible. We hold that the warrantless search which provided probable cause for issuance of the search warrant was lawful because on the particular facts of this record Sea-Land possessed a general, unrestricted independent right of access to the van.

We reach this conclusion primarily on the basis of the testimony of Sea-Land's terminal manager, Ernest Webb. This witness testified that during the times in question Sea-Lands' van No. 44088 was parked in Sea-Land's terminal yard. Concerning Sea-Land's rights of access to the van, Webb testified that in general Sea-Land had the authority to enter any of its vans to inspect freight, and also possessed the "right and privilege" to add additional freight. According to Webb, a shipper could specify in the bill of lading that he desired the exclusive use of a van. When such a request was made, the carrier could not add additional freight to the particular van. According to Webb, such exclusive use status would not prohibit Sea-Land from opening the van for inspection purposes. In regard to the shipment in question, Webb testified that Sea-Land could have removed all of appellant's freight from van No. 44088 and shipped it to Seattle in a different van. This possibility existed because all that Sea-Land had contracted for was to move the freight. It had not contracted "for any given amount of space or * * * in other words we do not guarantee space in any particular container." Webb further explained that seals on vans (such as the one he broke to gain access to van No. 44088) were used as devices to protect the carrier against claims for shortages. Sea-Land's terminal manager also stated that his company had inspection rights under its own tariff No. 116 and under certain regulations contained in the National Motor Freight classifications. Unfortunately, the applicable regulations and tariff under which Sea-Land claims rights of inspection were not made part of this record on appeal. Nevertheless, we think Webb's testimony provides a sufficient basis for the conclusion that the warrantless entry and observation of the interior of Sea-Land's van No. 44088 by Investigator Taylor and Officer Anderson was not violative of appellant's constitutional protection against unlawful searches and seizures. For it can be reasonably concluded from Webb's testimony that Sea-Land enjoyed an independent unrestricted right of access to van No. 44088 which was equal to or greater than appellant's rights in the matter. From this independent right of access on Sea-Land's part, it follows that Webb, on behalf of Sea-Land, had authority to consent to the police accompanying him when he entered the interior of van No. 44088. This follows from the well established rule in searches and seizures that given joint-right-of-access, the consent of one holding such

3. In the inventory filed by the police in conjunction with this search warrant, it is stated that the following items were obtained:
   One 30 Blade Brass Propeller with double Sleeve 2½ to 2 in taper and keyed for Shaft.

(also included 1240 lbs. of Brass fittings, Valves.) Case # 68–2578. (also include 2180 lbs. of copper wire. A.S.T. Case Valdez.)

rights is held sufficient justification for a warrantless search by government officers.[4] Typical of cases embracing this rule are those where a wife has consented to a search of premises which she occupies jointly with her husband. There the power to consent to search does not rest on agency for a joint occupant generally has no authority to waive the rights of the other. The underlying theory of these consent cases is that it would deny the consentor's own equal or superior right of access were he unable to lead police through the area over which his property rights extended.[5] In short, Webb's testimony establishes that Sea-Land possessed an independent unrestricted right of access into the interior of the van, which right encompassed the right to lead others into it, including the police.

In support of his position that the initial warrantless search of the van by the police required suppression of the evidence in question, appellant relies on Corngold v. United States.[6] In *Corngold,* govern-

ment agents and employees of the carrier, TWA, together opened defendant's sealed package and found unlawfully imported watches. This search occurred after government agents had detected radioactivity emanating from the package and had informed the carrier that defendant has used a false name on the waybill. The court in *Corngold* held that this was an unlawful search and seizure. The gist of the court's holding was that although in form, this was an authorized carrier inspection; in substance it was a search aided by the carrier solely for the government's benefit. The court further held that even if the carrier acted for its own benefit as well, the search was unlawful because government agents participated, and such participation turned the inspection into a government search. The court reasoned that the inspection clause authorized only inspection by the carrier itself, and did not constitute consent by the carrier to a search conducted by government officials.[7]

4. In People v. Schwartz, 54 Misc.2d 34, 281 N.Y.S.2d 246 (Sup.Ct.1967), the court held that the owner and joint occupant of a two-car, unpartitioned garage may open its door and permit police to enter. In Nelson v. People, 346 F.2d 73 (9th Cir. 1965), it was held that a defendant's mistress with keys to their jointly occupied apartment may consent to a police search of jointly occupied parts of the apartment. United States v. Eldridge, 302 F.2d 463 (4th Cir. 1962), held that where a defendant lends his car to a friend, giving him the trunk key, as well as the ignition key, the friend may consent to a search of the trunk. In Spencer v. People, 429 P.2d 266, 163 Colo. 182 (Colo.1967), it was held that the owner of a house may consent to a search of a bedroom to which her access is unlimited though defendant had been occupying it as a guest. *See* Slezak v. State, 454 P.2d 252 (Alaska 1969).

In Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684, 693–694 (1969), the court held that a joint user of a duffle bag had authority to consent to its search.

5. Stoner v. California, 376 U.S. 483, 488, 84 S.Ct. 889, 11 L.Ed.2d 856, 860 (1964) ; Anderson v. United States, 399 F.2d 753

(10th Cir. 1968) ; Roberts v. United States, 332 F.2d 892, 896–897 (8th Cir. 1964).

*Stoner* held that a hotel night clerk cannot, by his consent for a police search of a room, bind the defendant who was using that room. The court reasoned the defendant's implied permission for maids, janitors, and repairmen to enter for performance of their duties did not embrace entry for other purposes such as a search. In *Stoner*, the court said:

[T]he rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.'

376 U.S. at 488, 84 S.Ct. at 892, 11 L. Ed.2d at 860.

6. 367 F.2d 1 (9th Cir. 1966).

7. In Corngold v. United States, 367 F.2d 1 (9th Cir. 1966), the court held:

It would be difficult to justify any conclusion other than that the TWA employee participated in the search solely to serve the purposes of the government. No doubt both the customs agents and the TWA transportation agent relied upon the inspection clause in TWA's tariff and the act of TWA's

But for Sea-Land's general unrestricted right of access to the interior of the van, and certain distinguishing factual circumstances in the record in the case at bar, we would follow *Corngold* and hold the warrantless search could not be sustained on the basis of any inspection rights Sea-Land possessed by virtue of any tariff provisions or applicable governmental regulations.[8] For in the case at bar the government's nexus with the warrantless inspection of the van was as significantly close as that of the government's influence and participation in *Corngold*.[9]

On the other hand unlike *Corngold*, here Sea-Land possessed a general independent unrestricted right of access to

the van. Of further importance is the fact that once inside the van the police did not open any of appellant's closed barrels which were stored there. As indicated previously, the police obtained a search warrant on the basis of a propeller which was not concealed inside any container but was visible to the officers after they had gained access to the interior of the van. In this regard, *Corngold* points out that

the contents of appellant's package were not observed during a search of TWA's loading area. They were disclosed by a search of the package itself. TWA and its employees had no right of access to appellant's package independent of appel-

---

agent in cutting open the outside package to furnish technical legal justification for the search. But as we have noted, the TWA employee himself testified that he opened appellant's package only because the government agents asked him to, and there is nothing else in the record which would indicate that the package was in fact opened for any purpose of the carrier—it does not appear, for example, that the rate for carrying furniture and watches differed, or that the carrier took any action on its own behalf when the mislabeling was revealed. 367 F.2d at 5.

\*     \*     \*     \*     \*

Appellant did not abandon his package; and mere surrender of custody to a carrier did not forfeit appellant's right to privacy. See Ex parte Jackson, 96 U.S. 727, 733, 24 L.Ed. 877 (1878); Santana v. United States, 329 F.2d 854, 856 (1st Cir. 1964); Oliver v. United States, 239 F.2d 818, 820–821, 61 A.L.R.2d 1273 (8th Cir. 1957). He did not expressly authorize TWA to consent to search of his package by customs agents. Therefore, unless appellant impliedly authorized TWA to acquiesce in such a search, TWA's consent could not bind appellant. The facts negate any intention to grant TWA such broad authority. Appellant's package, securely wrapped and tied, was delivered to the airline solely for transportation from Los Angeles to New York, and the inspection clause in TWA's tariff authorized examination only by the carrier itself. 367 F.2d at 7–8.

8. On this inspection issue we believe that *Corngold* is the better reasoned of the circuit court decisions pertaining to inpection-searches and seizures. In United States v. Blum, 329 F.2d 49, 52 (2d Cir. 1964), government agents with the permission of R.E.A. opened the package in question and found 2,149 Swiss watch movements which did not have any required importer's symbol. There the court disposed of the appellant's suppression contentions saying:

We find no merit in the claim of unreasonable search and seizure. R.E.A. had a right to open the carton and examine the contents, which were misdeclared on the waybill. The electronic devices had indicated that the contents were other than the declared cutlery, justifying inspection under the right reserved in R.E.A.'s Express Classification. 329 F.2d at 52.

Gold v. United States, 378 F.2d 588 (9th Cir. 1967), holds that evidence turned up by an airline's search of defendants' package may be admitted where a federal agent merely informed the airliner of mislabelling of the packages, then left. The inspection was an airline inspection to discover mislabelling, permitted under the waybill, and the government participation was too slight to make it a government search. *See also* People v. McGrew, 1 Cal.3d 404, 82 Cal.Rptr. 473, 462 P.2d 1 (1969).

9. Webb testified that under its inspection rights, Sea-Land could inspect to determine if the shipment was properly loaded, if any additional space was available, and to determine what items were actually shipped.

lant's consent. The right of the customs agents to search appellant's package must rest upon a showing that appellant himself waived his personal right of privacy 'by word or deed, either directly or through an agent.' [10]

We think the interior of Sea-Land's van No. 44088 stands on the same footing as TWA's loading area in *Corngold.* In reasoning that TWA could grant access to its own loading area without regard to appellant's wishes, the Ninth Circuit distinguished

> cases holding that the rights of the owner of personal property was not violated where the property is observed during a search made with the consent of another who has an equal and independent access to the place searched. See, e. g., Nelson v. People of State of California, 346 F.2d 73, 77 (9th Cir. 1965); Burge v. United States, 342 F.2d 408 (9th Cir. 1965); Von Eichelberger v. United States, 252 F.2d 184, 186 (9th Cir. 1958); Woodard v. United States, 102 U.S.App. D.C. 393, 254 F.2d 312 (1958). The

independent right to authorize entry does not depend upon the wishes of the owner of personal property which may be on the premises.[11]

Here Sea-Land had "an equal and independent right of access" to the interior of the van, had consented to the presence of Officers Taylor and Anderson inside the van, and the actual scope of the officers' warrantless search did not reach into any of the sealed barrels or containers appellant had placed in the van. Thus, we hold that Investigator Taylor's warrantless observation of the propeller did not taint the search warrant subsequently obtained or require the suppression of any evidence seized under the warrant. Under the circumstances, the interior of Sea-Land's van was not a constitutionally protected area, nor were any reasonable expectations of privacy appellant might have entertained regarding the uncrated propeller unlawfully impinged upon.[12]

The judgment and commitment entered below is affirmed.[13]

BONEY, C. J., not participating.

10. Corngold v. United States, 367 F.2d 1, 7 (9th Cir. 1966).

11. *Id.* at 7.

12. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

13. In this appeal, we are not asked to decide whether the search warrant sufficiently particularized the items to be seized or whether the seizure of the items in question was proper under the wording of the warrant.